**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| LG DISPLAY CO., LTD.,<br><br>Plaintiff,<br><br>v.<br><br>OBAYASHI SEIKOU CO., LTD., NAOTO HIROTA, and SAKAE TANAKA<br><br>Defendants. | ) | Case No: 1:11-CV-1637 (RLW) |

**<u>DEFENDANTS' OPPOSITION TO LG DISPLAY'S MOTION FOR PARTIAL SUMMARY JUDGMENT</u>**

MICHAEL J. BARTA (DC Bar No. 431663)
RYAN E. BULL (DC Bar No. 481743)
R. PAUL ZEINEDDIN (D.C. Bar No. 474734)
ANDREW GEORGE (D.C. Bar No. 988552)
JOSHUA BARRON (D.C. Bar No. 999152)

BAKER BOTTS L.L.P.
1299 Pennsylvania Ave., N.W.
Washington, D.C. 20004-2400
Tel: (202) 639-7700
Fax: (202) 639-7890

*Attorneys for Defendants Obayashi Seikou Co., Ltd., Naoto Hirota, and Sakae Tanaka*

# TABLE OF CONTENTS

**Page No.**

Introduction .......... 1

Factual Background .......... 3

A. Mr. Hirota's Invention .......... 4

B. The Dispute With LG .......... 5

C. The National Court Litigation .......... 8

1. The Korean Litigation .......... 8

2. The Japanese Litigation .......... 9

Argument .......... 9

A. Summary Judgment Is A Severe Remedy .......... 10

B. Comity Should Not Be Granted On A Summary Basis Because There Is Significant Evidence That The Korean Judgment Violates Fundamental Public Policy And Offends Confidence In The Administration of Justice. .......... 11

1. Korean Judgments Are Not Afforded Any Lower Standard of Review Than Any Other Foreign Judgment .......... 12

2. A Foreign Judgment Entered In Violation Of Universal Principles Of Contract Should Not Be Granted Comity .......... 15

C. If This Court Does Not Reject Comity Outright, It Should Wait For Japanese Courts To Give The Agreement A Proper Hearing. .......... 20

D. In Any Case, The Korean Judgment Does Not Address Ownership of the '980 Patent. .......... 21

Conclusion .......... 24

Certificate of Service .......... 26

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Ackerman v. Levine*,
788 F.2d 830 (2d Cir. 1986)....................12

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)....................10

*Byblos Bank Europe, S.A. v. Syrketi*,
819 N.Y.S.2d 412 (N.Y. Sup. Ct. 2006)....................20

*Choi v. Kim*,
50 F.3d 244 (3d Cir. 1995)....................14

*Daewoo Motor America, Inv. v. General Motors Corp.*,
459 F.3d 1249 (11th Cir. 2006)....................14

*Euclid Chemical Co. v. Vector Corrosion Technologies, Inc.*,*
561 F.3d 1340 (Fed. Cir. 2009)....................23, 24

*Films by Jove, Inc. v. Berov*,
250 F. Supp. 2d 156 (E.D.N.Y. 2003)....................20

*Fla. E. Coast Ry. Co. v. Seaboard Coast Line R. Co.*,
No. 81-0269, 1982 WL 1926 (D.D.C. Dec. 23, 1982) (Johnson, J.)....................15

*Hilton v. Guyot*,
159 U.S. 113 (1895)....................11

*Hurst v. Socialist People's Libyan Arab Jamahiriya*,*
474 F. Supp. 2d 19 (D.D.C. 2007)....................21

*In re Korean Air Lines Disaster of Sept. 1, 1983*,
597 F. Supp. 613 (D.D.C. 1984)....................10

*Int'l Union of Operating Eng'rs v. Ray Haluch Gravel Co.*,
792 F. Supp. 2d 129 (D. Mass 2011)....................16

*Kahn v. Parsons Global Servs, Ltd.*
428 F.3d 1079 (D.C. Cir. 2005)....................11

*Lloyd v. Mukasey*,
568 F. Supp. 2d 2 (D.D.C. 2008)....................16

*Murray v. City of Charleston*,
96 U.S. 432 (1877)........................................................................................12

*Owen v. Owen*,
427 A.2d 933 (D.C. 1981) ..................................................................................15

*Pogostin v. Pato Consol. Gold Dredging, Ltd.*,
No. 79 Civ. 5433, 1981 WL 1613 (S.D.N.Y. Mar. 23, 1981) ...............................21

*Roberts v. Browning*,
610 F.2d 528 (8th Cir. 1979) ...............................................................................10

*Somportex Ltd. v. Phila. Chewing Gum Corp.*,
453 F.2d 435 (3d Cir. 1971).................................................................................11

*Tahan v. Hodgson*,*
662 F.2d 862 (D.C. Cir. 1981).................................................................11, 12, 14

*TermRio S.A. E.S.P. v. Electranta S.P.*,
487 F.3d 928 (D.C. Cir. 2007).........................................................................11, 12

*United States v. Tortella*,
No. 87-0257, 1987 WL 11413 (D.D.C. May 14, 1987) (Greene, J.)......................15

*Vagenas v. Continental Gin Co.*,
988 F.2d 104 (11th Cir. 1993) ..............................................................................15

**OTHER AUTHORITIES**

1 Williston on Contracts § 5:3 (4th ed. 2011).........................................................16

Federal Rule of Civil Procedure 56(d)......................................................10, 11, 19

Federal Rule of Civil Procedure 56(f) ..................................................................11

Kenneth J. Vandevelde, *The Bilateral Investment Treaty Program Of The United States*,
21 CORNELL INT'L L.J. 201, 206–07, n.53, n.60 (1988).........................................14

Restatement (Second) of Contracts § 59...............................................................16

Restatement (Third) of Foreign Relations Law § 481 cmt. c (1987).......................21

Restatement (Third) of Foreign Relations Law § 482(2)(e) ...................................20

Defendants Obayashi Seikou Co., Ltd. ("Obayashi") and Naoto Hirota ("Hirota"), (together "Defendants"), through undersigned counsel, hereby oppose Plaintiff LG Display Co., Ltd.'s ("Plaintiff" or "LG") Motion for Partial Summary Judgment.[1]

## INTRODUCTION

LG's motion for partial summary judgment presents a relatively straightforward tale: (i) LG obtained a judgment in Korea against Obayashi and Hirota, (ii) that judgment held that Obayashi and Hirota contractually transferred ownership of certain patents to LG pursuant to a putative settlement agreement, and (iii) that judgment addresses all three of the patents at issue in this case. In fact, the history of this dispute is far more complicated. There is a Korean judgment. That judgment indicates that LG obtained ownership rights to certain patents through a putative settlement agreement with Obayashi and Mr. Tanaka. But that is where the simplicity ends, and the questions begin.

As detailed below, there are serious grounds to believe that showing comity to the Korean judgment that LG has presented here—and altering ownership of U.S. patents on the basis of the judgment—would violate fundamental public policies of the United States and otherwise offend public confidence in the administration of justice. Those grounds include the following:

- When signing the putative settlement agreement in April 2004, Mr. Hirota, acting for Obayashi, expressly and unequivocally conditioned acceptance of the settlement proposal on LG's agreement that a license agreement with Hitachi would remain valid and confidential. LG rejected that counter proposal. The Korean court judgment does not address or discuss these facts.

- Between April 2004 and October 2005, LG and Obayashi actively negotiated toward a settlement of their dispute, meeting multiple times in Vietnam and

[1] Defendant Sakae Tanaka joins in Defendants' opposition, but expressly reserves, and does not waive, his personal jurisdiction defense.

exchanging proposals. No agreement was ever reached during these negotiations. The Korean judgment does not address or discuss these facts.

- In September 2004, LG represented to this Court (in a prior filed case) that settlement discussions were ongoing between Obayashi and LG, and asked this Court not to enter a default judgment in light of those ongoing negotiations. We presume that LG would not have deceived a U.S. court. In Korea, however, LG argued—and the Korean courts accepted—that LG and Obayashi had reached a settlement agreement in April 2004. Again, the Korean judgment does not address LG's acknowledgement in September 2004 (five months after the alleged agreement) that the parties were still negotiating and still had not reached an agreement.

- LG only executed the putative settlement agreement in October 2005, almost 18 months after Mr. Hirota had conditionally signed the agreement and made his counteroffer. At that time, LG purported to accept that Obayashi's existing license agreements would remain valid, and confidential. Yet negotiations with Obayashi and Mr. Hirota continued even after LG's putative acceptance of the counteroffer. Again, the Korean judgment does not confront or address the incredible circumstances of this acceptance at all.

- The net result is that the Korean courts enforced a putative settlement agreement pursuant to which Obayashi and Tanaka (a small Japanese company and a Japanese individual) transferred ownership to valuable patents to LG (a large Korean corporation) for no consideration, notwithstanding that LG stipulated during the Korean litigation that the technology transferred had not been developed by LG employees. Again, the Court reached this result without any discussion of these facially controversial facts and circumstances.

In part because of issues such as these, Obayashi and Tanaka have commenced independent litigation in Japan that asks the Japanese courts to review the putative settlement agreement and assess the ownership of patents found in Korea to have been transferred to LG. Japan, like Korea, is an ally of the United States whose judgments the courts of the United States tend to respect.

Under these circumstances, this Court is not compelled to show comity to the Korean judgment—on a summary basis—and alter the ownership of U.S. patents. There are serious grounds to believe that the Korean courts reached an unjust and illogical result that cannot be

reconciled with U.S. public policy. Because the same issues are being fully briefed in the courts of Japan, this Court can withhold its judgment on the Korean judgments until the Japanese courts have also completed their review. At the very least, this Court should permit discovery that would aid in understanding whether there is a factual justification for the result the Korean court reached that comports with fundamental notions of public policy and instills confidence in the administration of justice.

If the Court is inclined to enforce the Korean judgment in summary proceedings—notwithstanding the serious questions raised herein—it cannot rely on the Korean judgment to resolve issues that were not decided by the Korean judgment. Specifically, one of the three patents at issue in this case was not addressed in the Korean judgment. For that reason, the Korean judgment cannot provide a basis for this Court to summarily change the ownership of that patent.

While it may be appropriate to show comity to many foreign money judgments as a matter of law, the numerous and substantial questions that exist about the Korean judgment at issue here, and the fact that LG seeks to change ownership of the U.S. patents on the basis of that judgment, compel this Court to conduct its own independent inquiry as to the ownership of the patents at issue here. At the very least, *scrutiny* of the judgment aided by appropriate discovery, not comity on a summary basis, is appropriate.

## FACTUAL BACKGROUND

LG's Motion for Partial Summary Judgment asks this Court to direct Obayashi and Hirota to transfer ownership of three United States patents—U.S. Patent Nos. 6,288,763 ("the '763 patent"), 6,999,049 ("the '049 patent"), and 7,098,980 ("the '980 patent") (collectively the "patents-in-suit")—to LG. LG Partial Mot'n Summ. J. at 12. The basis for LG's motion is a

Korean court judgment that concluded LG, Obayashi and Mr. Tanaka reached an agreement concerning the transfer of certain patent rights, and held that this agreement should be enforced under Korean law. *Id.* at 9-12. Because it is important to understand the significant questions raised by the Korean judgment, we review here (i) how Mr. Hirota invented the technology in question, (ii) the negotiations between LG and Obayashi that led to the supposed settlement agreement, and (iii) the court proceedings in Korea and Japan that have been spawned by LG's claims to ownership of the technology in question.

**A. Mr. Hirota's Invention**

Naoto Hirota is a trained engineer holding bachelors and masters degrees in engineering. *See* April 15, 2012, Declaration of Naoto Hirota ("Hirota Decl.") ¶ 3. He is the President of Obayashi Co., which holds numerous liquid-crystal display ("LCD") and camera-related patents on which he is named as inventor. *Id.* ¶ 4. Mr. Hirota's interest in LCD technology dates back about three decades to when he was an employee at Sony, where he worked with Sakae Tanaka. *Id.* ¶ 10. Mr. Hirota found Mr. Tanaka's work in the LCD field interesting, and after Mr. Tanaka left Sony they continued to correspond regarding advances in the field. *Id.* Mr. Hirota began reading LCD-related scientific literature and attending LCD-related conferences. *Id.* One particular conference in 1995 piqued Mr. Hirota's interest. *Id.* ¶ 12. He learned about a new display mode for LCD screens—In-Plane Switching ("IPS")—which allowed a much wider viewing angle than prior modes. *Id.* And he began researching related articles and patents. *Id.*

Typical LCDs involved liquid crystals between conducting glass substrates, oriented at a certain "pre-tilt" angle to ensure the LCD's proper alignment. *Id.* ¶ 13. Mr. Hirota learned that a small pre-tilt angle is required to obtain IPS's wide viewing angle in a single-domain LCD structure (where all the liquid crystal molecules point the same way). *Id.* It was assumed that a

double-domain structure (where the crystals point different ways) would permit a wide viewing angle regardless of pre-tilt angle. *Id.* Mr. Hirota theorized that a pixel electrode could rotate liquid crystal molecules in two directions (left and right) even in the single-domain process described by Hitachi patent JPA H07-134301. *Id.* ¶ 14. Hitachi's patent assumed a structure with electrodes extended at a 45-degree angle, requiring a high driving voltage. *Id.* But Mr. Hirota theorized that lower angles with a lower driving voltage could be achieved by crossing the pixel electrode with the common electrode. *Id.* This formed the basis for his invention: a "zigzag" IPS LCD mode. *Id.*; *see also* Hirota Decl. Exs. A–C (the patents-in-suit).

Mr. Tanaka, who was setting up a factory for LG in Korea during this time, played no part in this inventive process. *See* Hirota Decl. ¶ 15; Tanaka Decl. ¶ 7. Rather, Mr. Hirota sought Mr. Tanaka's advice *after* having come up with his idea, as he sought advice on the invention's novelty. *See* Hirota Decl. ¶ 15. Mr. Tanaka advised Mr. Hirota to pursue a patent in Japan and helped in the Japanese patenting process free of charge. *Id.*; *see* Tanaka Decl. ¶¶ 7, 8. Mr. Tanaka also informed LG of the invention. *See* Hirota Decl. ¶ 22.

After receiving his Japanese patents, Mr. Hirota applied for patents in other nations, including the United States. Mr. Tanaka had nothing to do with that process. *Id.* ¶ 16; *see* Tanaka Decl. ¶¶ 7, 8.

### B. The Dispute With LG

In early 2003, Obayashi sent a licensing offer to LG, along with Hitachi, Sony, Samsung and NEC. *See* Hirota Decl. ¶ 18; Hirota Decl. Ex. D (Early 2003 letters regarding licensing of invention). Hitachi agreed to a licensing arrangement, *see* Hirota Decl. ¶ 18; Hirota Decl. Ex. E (Hitachi License Agreement), whereas LG took a decidedly different tack.

After months of discussion, LG suddenly asserted on October 28, 2003, that Mr. Hirota's invention had been stolen from LG. LG demanded that Mr. Hirota transfer ownership of the invention. *See* Hirota Decl. ¶ 20; Hirota Decl. Ex. H (October 28, 2003 Letter from LG to Obayashi).[2] On December 30, 2003, LG filed suit against Obayashi in this Court, challenging the validity and enforceability of the '763 Patent. *See* Exhibit B (December 30, 2003 LG Complaint against Obayashi). On August 23, 2004, this Court issued an Order requiring that the parties show cause as to why a default judgment should not be entered against Obayashi. *See* Exhibit C (August 23, 2004 Show Cause Order). LG responded in <u>September 2004</u> by requesting that the case be dismissed without prejudice because "[the parties] are <u>currently</u> engaged in negotiations regarding the settlement of this dispute. Settlement negotiations have been protracted due to the geographic dispersion of the parties and the complexity of the issues involved." *See* Exhibit A at 1 (LG Resp. to Show Cause Order) (emphasis added). The case was dismissed without prejudice six days later. *See* Exhibit D (September 13, 2004 Order Granting Mot'n for Voluntary Dismissal Without Prej.). Notably—in stark contradiction to the representation made to this Court in September 2004—LG asserts in its complaint in this case

---

[2] LG Display represented otherwise in 2007, when it stipulated before the Korean court that it "didn't have any dispute concerning the fact that the inventions of this case <u>don't</u> fall under the employee invention specified in Article 39 of the Patent Law." *See* Kim Decl. Ex. B at 264 (Defense Preparation Deadline Report) (emphasis added) (referring to the Korean Patent Act, Act. No. 7554, May 31, 2005, art. 39(1), which governs employee inventions.) LG maintained this position throughout the Korean litigation. Having made that stipulation in Korea, LG Display now seems to have returned to its original position that Mr. Hirota's invention was in fact invented by LG Display employees. Complaint ¶ 69 ("By means of example, Tanaka, an employee at LG Display . . . wrongly acquired and disclosed LG Display's trade secrets to third parties, including at least Obayashi and Hirota. Defendants then wrongfully used and continue to use LG Display's trade secrets by, for example, jointly preparing and filing patent applications.").

that, "In April 2004, the parties reached a Settlement Agreement." *See* Complaint ¶ 36 (emphasis added).

When LG sent its October 28, 2003, letter challenging Mr. Hirota's status as inventor, Mr. Hirota was busy with Obayashi's activities in Vietnam. *See* Hirota Decl. ¶ 20. He asked Mr. Tanaka to handle the issue, but was unaware that Mr. Tanaka was ill at the time and unable to assist. *Id.* In March 2004, Mr. Tanaka and Mr. Hirota spoke about the situation and surmised that an earlier report by Mr. Tanaka to LG about Mr. Hirota's invention was probably the source of LG's contention that Mr. Tanaka was the true inventor. *Id.* ¶ 22.

On March 23, 2004, Mr. Hirota received a draft agreement from LG stating that his invention was an LG employee invention, and assigning the patents to LG. *Id.* ¶ 23; Hirota Decl. Ex. I. He forwarded the agreement to Mr. Tanaka, who, still quite sick, was coming under heavy pressure from LG to resolve the issue. *See* Hirota Decl. ¶¶ 23, 24. Mr. Tanaka signed the agreement and returned it to Mr. Hirota. *Id* ¶ 24. Mr. Hirota reasoned that Mr. Tanaka's earlier report to LG must have given LG some claim to his invention, and he feared the effort and cost of fighting LG's legal team. *Id.* He decided to sign LG's agreement and transfer the patents indentified therein to LG *on one very important condition*: the license agreement with Hitachi would remain valid and confidential, and he would keep the proceeds of the agreement. *Id.* ¶¶ 24, 25; Hirota Decl. Ex. J (April 3, 2004 Letter from Obayashi to LG).

Accordingly, on April 3, 2004, Mr. Hirota signed the draft agreement on behalf of Obayashi, but stated that he was only willing to transfer the patents if he did not have to void, transfer, or even disclose the terms of the Hitachi license agreement. *See id.* LG understood that Mr. Hirota's response was a counter-proposal. *See* Hirota Decl. ¶ 26; Hirota Decl. Ex. K (April 21, 2004 Facsimile from LG to Obayashi, beginning "thank you for your acceptance and

proposal"). That counteroffer was rejected by LG, and negotiations continued over the course of the next few months, culminating in a new draft agreement on October 12, 2004. *See* Hirota Decl. ¶ 26; Hirota Decl. Ex. P (October 12, 2004 Facsimile from LG to Obayashi). But Mr. Hirota rejected this draft agreement, as it varied from his understanding of the parties' earlier oral understanding at their negotiations in Vietnam. *See* Hirota Decl. ¶ 26; Hirota Decl. Ex. Q (October 14, 2004 Letter from Obayashi to LG).

Negotiations stagnated. Then, on October 11, 2005, LG suddenly wrote to Mr. Hirota purporting to accept the April 2004 counteroffer that had been rejected almost 18 months before. *See* Hirota Decl. ¶ 27; Hirota Decl. Exs. K, R (October 11, 2005 Facsimile from LG to Obayashi). Even after this letter from LG, no one appeared to believe that an agreement had been reached and negotiations continued. *See* Hirota Decl. ¶ 28.

### C. The National Court Litigation

#### 1. The Korean Litigation

In 2006 LG filed an action against Defendants and Mr. Tanaka in Korean Court. *See* Kim Decl. ¶ 3; Kim Decl. Ex. E (Korean Complaint). LG represented to the Korean court that the settlement agreement had been reached in April 2004, and the Korean courts accepted the April 2004 agreement as if it was a complete instrument. *See* Kim Decl. ¶ 6 & Ex. C at 4-5; Kim Decl. Ex. D at 5-6. The District Court held that it lacked jurisdiction to adjudicate the transfer of the non-Korean patents, and denied the transfer of the Korean patents after finding that the purported settlement agreement invalid because it was based upon a mistaken belief the inventions were LG employee inventions. *See* Kim Decl. Ex. C at 11, 15-17 (Seoul Central District Court Judgment). The High Court reversed, *see* Kim Decl. Ex. D at 20 (Seoul High Court Judgment), and was affirmed by the Korean Supreme Court, which issued a final judgment

requiring transfer of the ‘763 and ‘049 Patents. *See* Kim Decl. Ex. D at 22 (Seoul High Court Judgment); Jung Decl. 6E at 6.[3] The ‘980 Patent was never mentioned throughout the Korean litigation. *See* Kim Decl. ¶¶ 4-6, 10, Kim Decl. Exs. C (Seoul Central District Court Judgment), D (Seoul High Court Judgment).

**2. The Japanese Litigation**

Currently Obayashi and LG are litigating many of the same issues presented here in the Tokyo, Nagoya, and Mito District Courts in Japan. In one of these cases, the Tokyo case, Obayashi and LG dispute the purported settlement agreement. *See* April 15, 2003 Declaration of Hideaki Kobayashi (“Kobayashi Decl.”) ¶ 4; Kobayashi Decl. Ex. A at 9-11 (February 20, 2012 Obayashi Brief). The Tokyo case features the argument that the purported settlement agreement was never a duly executed contract. *See id.*

## ARGUMENT

LG presents its motion for summary judgment as a simple matter of enforcing a Korean judgment, but strategically avoids discussion of the purported settlement agreement on which that judgment rests. For LG, that is a necessary strategic choice because the facts surrounding the negotiation of the putative settlement agreement, and the failure of the Korean courts to address those facts in any way, make it clear that justice has not been served in Korea. The Korean judgment does not deserve comity because, as explained below, it violates fundamental principles of public policy relating to contracts and otherwise offends public confidence in the

[3] To be clear, the final Korean judgment was against Mr. Tanaka and Obayashi, not Mr. Hirota. Although LG Display cites to a document that lists Mr. Hirota as a Defendant, *see* LG Display Mot’n for Summ. J. at 3 (citing Jung Decl. ¶ 5; Ex. 1E), Mr. Hirota is not named as a defendant in any of the Korean judgments, *see* Kim Decl. Exs. C, D; Jung Decl. Ex. 6E even in LG Display’s own translation of the judgments. *See* LG Display Mot’n for Summ. J. Exs. 2E, 4E, 6E.

administration of justice. Under the circumstances, it is not appropriate that the Court grant summary judgment enforcing the Korean judgment. If the Court does not disregard the Korean judgment, it should defer resolution on its effectiveness until the Japanese courts have addressed all the facts surrounding the disputed agreement. Alternatively, the Court should permit discovery into the negotiations that led to the supposed settlement agreement, as well has how LG represented (or misrepresented) that history to the Korean courts before determining whether to grant comity to the Korean judgment. In any event, even if this Court grants comity to the Korean judgment, it must not do so with respect to the '980 Patent, as that patent was <u>not</u> addressed by that judgment.

### A. Summary Judgment Is A Severe Remedy

Summary judgment is a "severe" remedy that should not be hastily used, especially where the movant alone possesses the discovery materials necessary to ensure its proper invocation. *In re Korean Air Lines Disaster of Sept. 1, 1983*, 597 F. Supp. 613, 618 (D.D.C. 1984). And "even if a district judge feels that summary judgment in a given case is technically proper, sound judicial policy and the proper exercise of judicial discretion may prompt him to *deny* the motion and permit the case to be developed fully at trial." *Id*. (quoting *Roberts v. Browning*, 610 F.2d 528, 536 (8th Cir. 1979)). Where a summary judgment opponent demonstrates, under Federal Rule of Civil Procedure 56(d), that the record is lacking as to an issue that could bear upon summary judgment, the Court can and should delay judgment until that record is complete, without considering "the likelihood that discovery will prevent the entry of summary judgment . . . ." *Id.*; *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (holding that, in ruling on a motion for summary judgment, the court must draw all justifiable inferences in the nonmoving party's favor and accept the nonmoving party's evidence

as true ); *Kahn v. Parsons Global Servs, Ltd.* 428 F.3d 1079, 1087 (D.C. Cir. 2005) (explaining that "a party opposing summary judgment needs a 'reasonable opportunity' to complete discovery before responding to a summary judgment motion and that 'insufficient time or opportunity to engage in discovery' is cause to defer decision on the motion").

### B. Comity Should Not Be Granted On A Summary Basis Because There Is Significant Evidence That The Korean Judgment Violates Fundamental Public Policy And Offends Confidence In The Administration of Justice

Plaintiff seeks partial summary judgment on the basis of international comity. The doctrine of international comity permits a United States court to enforce a foreign judgment obtained after a full and fair trial, before a court with jurisdiction, with the defendant present, after effective service of process, under a system of jurisprudence likely to secure an impartial verdict, without fraud or "any other special reason" for declining to do so. *Tahan v. Hodgson*, 662 F.2d 862, 864 (D.C. Cir. 1981) (quoting *Hilton v. Guyot*, 159 U.S. 113, 203, 202 (1895)). Comity does not require blind deference to any foreign judgment no matter how absurd its underpinnings:

> [Comity] is not a rule of law, but one of practice, convenience, and expediency. Although more than mere courtesy and accommodation, comity does not achieve the force of an imperative or obligation. Rather, it is a nation's expression of understanding which demonstrates due regard both to international duty and convenience and to the rights of persons protected by its own laws. Comity should be withheld only when its acceptance would be contrary or prejudicial to the interest of the nation called upon to give it effect.

*Somportex Ltd. v. Phila. Chewing Gum Corp.*, 453 F.2d 435, 440 (3d Cir. 1971). "In the classic formulation," this refers to "a judgment that 'tends clearly' to undermine the public interest, <u>the public confidence in the administration of the law</u>, or security for individual rights of personal liberty or of private property is against public policy." *TermRio S.A. E.S.P. v. Electranta S.P.*, 487 F.3d 928, 938 (D.C. Cir. 2007) (quoting *Ackerman v. Levine*, 788 F.2d 830, 841 (2d Cir.

1986)). If a foreign judgment is "repugnant to fundamental notions of what is decent and just in [the] State where enforcement is sought," then it does not deserve comity. *Id.* (quoting *Tahan*, 662 F.2d at 864).

Contract principles lie at the "foundations of all well-ordered society, and to prevent the removal or disturbance of these foundations was one of the great objects for which the Constitution was framed." *Murray v. City of Charleston*, 96 U.S. 432, 449 (1877). A contractual adjudication without regard for foundational contract principles necessarily violates public policy. That is exactly what happened in this case. Somehow the Korean litigation managed to proceed without considering the essence of basic contract principles: the effect of a conditional reply to an offer, the effect of a withdrawn offer, or the effect of elapsed time upon an unaccepted offer. Whatever the cause of these shortcomings, they gravely undermine public confidence that law and justice were properly administered. Such a judgment is not worthy of establishing—especially on a summary basis—property rights in the United States.

**1. Korean Judgments Are Not Afforded Any Lower Standard Of Review Than Any Other Foreign Judgment**

LG contends that under the Treaty of Friendship, Commerce and Navigation between the United States of America and the Republic of Korea, 8 U.S.T. 2217 (the "U.S. - Korea Treaty"), "Korean judgments have been elevated to the status of state court judgments, thus entitled to full faith and credit." *See* LG Mtn., at 2, 8. That is wrong. The U.S. - Korea Treaty does not address the status of Korean judgments. Article V, section 1 of the U.S. - Korea Treaty, on which LG relies, ensures only that Korean "[n]ationals and companies" will have the same "access" to U.S. courts as U.S. citizens and citizens of nations we favor:

> <u>Nationals and companies of either Party</u> shall be accorded national treatment and most-favored-nation treatment <u>with respect to access to the courts of justice and to administrative tribunals</u> and agencies

> within the territories of the other Party, in all degrees of jurisdiction, both in pursuit and in defense of their rights. (emphasis added)

This provision does not address the status of judgments at all. Nor do the congressional report on the treaty, or the communications by the President and Secretary of State to the Senate formally transmitting the treaty for ratification, indicate that the treaty has any bearing on the enforcement of judgments. *See* Exhibit E (Executive Report No. 5 of the Senate Committee on Foreign Relations, 85th Congress, 1st Session, July 10, 1957); Exhibit F (Transmittal Message from the President to Senate, Feb. 11, 1957). Instead, following the plain language of the treaty, these documents explain that the treaty merely grants Korean nationals and companies open access to U.S. courts. *See* Exhibit E at 2 (explaining that Article V of the treaty address "access to courts."); *see also* Exhibit F at 2, 3. Likewise, a prominent commentator on international law in reviewing the judicial access provisions to FCN's assigns no such weight to them. *See* Exhibit G (Kenneth J. Vandevelde, U.S. International Investment Agreements, 411-12 (2009)).

LG's interpretation of the U.S. - Korea Treaty would have wide-ranging consequences for the enforcement of foreign judgments in the United States. Indeed, Article V(1) of the U.S. - Korea Treaty corresponds in all material respects to Friendship, Commerce and Navigation treaties with such countries as Togo, Iran, Pakistan, and the Muscat and Oman Dependencies.[4] In all, the U.S. appears to have entered into at least 21 such treaties. *See* Kenneth J. Vandevelde, *The Bilateral Investment Treaty Program Of The United States*, 21 CORNELL INT'L L.J. 201, 206-7 & n.53, n60 (1988); *see also* Exhibit E at 7 (noting that the U.S. - Korea Treaty was the 16th of

---

[4] *See* Treaty of Amity and Economic Relations, United States—Togo, Feb. 8, 1966, Art. III (2), 18 U.S.T. 1, T.I.A.S. No. 6193; Treaty of Amity, Economic Relations and Consular Rights, Aug. 15, 1955, United States—Iran, Art. III(2), 8 U.S.T. 899, T.I.A.S. No. 3853; Treaty of Friendship and Commerce, Nov. 12, 1954, United States—Pakistan, Art. V(1), 12 U.S.T. 110, T.I.A.S. No. 4683; Treaty of Amity, Economic Relations and Consular Rights, Dec. 20, 1958, United States—Muscat and Oman Dependencies, Art. III(2), 11 U.S.T. 1835, T.I.A.S. No. 4530.

its kind as of 1957). Thus, if LG's interpretation of the access to court provision in the standard U.S. Friendship, Commerce and Navigation treaty were correct, the judgments of many foreign sovereigns would be entitled to full faith and credit in the U.S.

The law in the D.C. Circuit also reinforces that access to court protections like the one in the U.S. - Korea Treaty have no bearing on judgment enforcement issues. Thus, in *Tahan v. Hodgson*, 662 F.2d 862 (D.C. Cir. 1981), the D.C. Circuit applied traditional notions of comity in assessing whether to enforce an Israeli judgment, *id*. at 864, notwithstanding that Israel and the United States are party to a Friendship, Commerce and Navigation treaty that contains the same access to court protections as the U.S. - Korea treaty. *Id.* at 868 n.25. The law of this Circuit makes sense: Korean judgments receive the same deference as other nations—comity—and with it, the requirement that any foreign judgment accord with fundamental policy principles and basic notions of what is decent and just.

LG cites to *Daewoo Motor America, Inv. v. General Motors Corp.*, 459 F.3d 1249, 1259 (11th Cir. 2006) and *Choi v. Kim*, 50 F.3d 244, 248 (3d Cir. 1995) as supporting its argument. Putting aside that these decisions conflict with the law in this Circuit, they are not persuasive. In *Daewoo*, the Eleventh Circuit applied traditional notions of comity when determining whether to enforce a Korean bankruptcy order, rendering its conclusory statement concerning the effect of the U.S. - Korea Treaty dicta. *See Daewoo*, 459 F.3d at 1259-60. Similarly, the Third Circuit did not examine the text of the U.S. - Korea treaty in conclusorily stating that it "elevates a Korean judgment to the status of a sister state judgment." *See Choi*, 50 F.3d at 248. The Court cited to the Eleventh Circuit's decision in *Vagenas v. Continental Gin Co.*, 988 F.2d 104 (11th Cir. 1993), which interpreted a Friendship, Commerce and Navigation Treaty between the U.S. and Greece. *Id.* at 106. The summary reasoning of the *Vagenas* decision is disconnected from

the plain language of the treaty at issue in that case. The Greek treaty—like the U.S. - Korea Treaty—merely obligated states to afford a Greek national the same *access* to U.S. courts to enforce a judgment that any United States citizen would have. *Id.* No Friendship, Commerce and Navigation treaty speaks to what standard would be applied to enforcement of a foreign judgment.

In sum, the discretionary doctrine of comity is the standard that this Court must apply in assessing the impact of the Korean judgment on the ownership of the patents at issue.

**2. A Foreign Judgment Entered In Violation Of Universal Principles Of Contract Should Not Be Granted Comity**

Contract law is marked by certain fundamental principles. First among these is must be that the contracting parties' intent should be fulfilled. *See Fla. E. Coast Ry. Co. v. Seaboard Coast Line R. Co.*, No. 81-0269, 1982 WL 1926, at *8 (D.D.C. Dec. 23, 1982) (Johnson, J.) ("It is a fundamental principle of contract interpretation that a contract should be construed in a manner consistent with the parties' intent."); *see also United States v. Tortella*, No. 87-0257, 1987 WL 11413, at *1 (D.D.C. May 14, 1987) (Greene, J.) (interpreting a plea agreement under contract law and observing that "[a] fundamental principle of contract law is that, in order for a contract to be formed in the first instant, a meeting of the minds as to the terms of the agreement must exist."); *Owen v. Owen*, 427 A.2d 933, 937 (D.C. 1981) (describing the "manifestation of agreement or mutual assent by the parties to the terms" as a "fundamental principal of contract law").

Also fundamental are the principles that a conditional response to an offer is a counteroffer, *Restatement (Second) of Contracts* § 59, and that a counteroffer is not an acceptance, but a rejection of the original offer. *Lloyd v. Mukasey*, 568 F. Supp. 2d 2, 6 n.3 (D.D.C. 2008) ("Of course, a counteroffer is a rejection of an offer, *not* an acceptance.")

(emphasis in original); *Int'l Union of Operating Eng'rs v. Ray Haluch Gravel Co.*, 792 F. Supp. 2d 129, 131 (D. Mass 2011) ("Under fundamental principles of contract law, a counteroffer operates as a rejection of the original offer.") (internal quotation marks and citation omitted). Finally, it is fundamental that an offer, once rejected, cannot later be accepted. 1 Williston on Contracts § 5:3 (4th ed. 2011) ("When an offer has been rejected, it ceases to exist, and a subsequent attempted acceptance is inoperative."). And Korean law is no different on any of these fundamental points. *See* Kim Decl. ¶ 9.

Because the Korean judgment violates universal and fundamental principles of law and offends confidence in the administration of justice, it should not be shown comity in the United States. Indeed—the following facts which the Korean judgment neglects to address at all—are beyond dispute.

- On March 23, 2004, Plaintiff transmitted a fax to Mr. Hirota that included a proposed settlement agreement. *See* Hirota Decl. ¶ 23; Hirota Decl. Ex. I.
- On April 3, 2004, Mr. Hirota responded with a signed copy of that agreement, *attached* to a letter that stated, among other things: "I want to accept your all proposal except one item. If you can't approve bellow [sic] point I can't approve your proposal at all." *See* Hirota Decl. Ex. J (emphasis added). That is a textbook example of a conditional reply; i.e., a rejection and counteroffer.
- Plaintiff proposed a solution in its next correspondence, on April 21, 2004, which included an attached proposal regarding the Hitachi issue. *See* Hirota Decl. Ex. K (April 21, 2004 Facsimile from LG to Obayashi).

- Mr. Hirota rejected that proposal, *see id.* Ex. Las Plaintiff's next communication acknowledged: "[w]e are very disappointed to hear that you could not accept our proposal on Hitachi license." *See id.* Ex. M.
- Over the next year and a half, negotiations continued. *See* Hirota Decl. ¶¶ 25-27. In-person negotiations were held in Vietnam. *Id.* ¶ 26. New agreements were proposed by LG, *See* Hiroto Decl. Exs. K, P, and rejected by Mr. Hirota. *See id.* Exs. L, Q.
- During this period, in September 2004, LG represented to this Court in the first action that it filed against Obayashi that settlement discussions were ongoing. *See* Exhibit A at 1-2 (September 7, 2004 LG Response to Show Cause Order)
- On <u>October 11, 2005</u>, after a year and a half of ongoing negotiations, LG suddenly purported to accept Mr. Hirota's <u>April 3, 2004</u>, counteroffer. *See* Hirota Decl. ¶ 27; Hirota Decl. Ex. R. Plaintiff's fax stated:

> <u>We received your signed Settlement Agreement on April 3, 2004</u>, which we had sent you to resolve our IPS patent issue. <u>We accept your proposal</u> for the existing contract between you and [Hitachi] before the Settlement Agreement. According to the Settlement Agreement, you agreed to transfer and assign all the rights to 19 patents to LG Philips LCD. <u>Thus, we send you the valid Settlement Agreement</u> signed by me.

*See* Hirota Decl. Ex. R (emphasis added).

This background to the supposed "agreement" on which the Korean judgment was based was not addressed in the Korean judgments. Not at all. The failure to address such core evidence is in and of itself grounds to deny comity. At the very least, that the Korean courts did not address central evidence defining the parties relationship gives rise to specific grounds for further investigation into the representations made by LG in Korea to obtain such an outcome.

Plaintiff surely understands the severe deficiencies in the Korean judgment and hopes to brush them aside. LG's efforts to avoid the merits underlying the Korean judgment are demonstrated by three particular paragraphs from the Complaint that relate to the 2003 lawsuit before this Court in which Plaintiff sought a declaratory judgment that the '763 Patent was invalid:

> Paragraph 35: While the [2003 Suit] was pending, [the parties] entered into a series of negotiations regarding, *inter alia*, the ownership of and rights to inventions . . . . [And], [a]s part of those negotiations, Defendants promised that they would transfer ownership of the inventions disclosed in the patents-in-suit.
>
> Paragraph 36: In April 2004, the parties reached a Settlement Agreement, under which Defendants agreed to transfer the ownership of numerous patents . . . .
>
> Paragraph 37: Because Obayashi failed to make an appearance in [the 2003 suit], the Court issued an order requesting an explanation from Obayashi, with default judgment as the alternative. LG Display, however, in reliance on the promises and agreements of Defendants and at their urging, refrained from seeking a default judgment and other relief and instead moved to dismiss the action without prejudice. On September 9, 2004, this Court granted the motion.

A plain reading of these paragraphs shows a seemingly logical chain of events: Plaintiff sued Defendant in 2003, the parties entered negotiations, they reached a settlement agreement in April 2004, then, as the Court was considering a default judgment, Plaintiff relied on the settlement agreement in dropping the suit.

But these facts cannot be reconciled to reality. First, even if—somewhere—a counteroffer could be accepted after a year and a half of back-and-forth negotiations, no settlement agreement was reached in April 2004. Rather, the parties would have first reached a settlement on October 11, <u>2005</u>, when LG signed its own proposed agreement and purported to accept Obayashi's counteroffer. *See* Hirota Decl. ¶ 27; Hirota Decl. Ex. R. What instead

happened in April 2004 was *a rejection* of Plaintiff's *first* proposed Settlement Agreement, i.e., a counteroffer. *See* Hirota Decl. ¶ 25; Hirota Decl. Ex. J.. Second, five months *after* the parties "reached" this so-called "Settlement Agreement," on September 7, 2004 (a date conveniently omitted from the Complaint), Plaintiff represented to this very Court that negotiations in the matter were ongoing. *See* Exhibit A at 1 (September 7, 2004 LG Response to Show Cause Order) ("[The parties] are <u>currently</u> engaged in negotiations regarding the settlement of this dispute. Settlement negotiations have been protracted due to the geographic dispersion of the parties and the complexity of the issues involved.") (emphasis added). Defendants agree—negotiations were very much ongoing in September 2004.[5]

No principle of international law requires that this Court give comity to a foreign judgment that makes no sense. Aside from the fact that the Korean judgment cannot be reconciled to fundamental notions of public policy, changing ownership of a U.S. patent on the basis of a foreign judgment that leaves open so many questions would offend confidence in the administration of justice. If this Court does not deny comity outright or defer a ruling pending the outcome of Japanese proceedings described below, it should permit document and deposition discovery under Rule 56(d) as to (i) the record of negotiations between LG and the Defendants between 2003 and 2005, and (ii) the full record of proceedings before the Korean courts, especially any and all representations made to those courts regarding the existence of a valid,

---

[5] During the negotiations, one thing *was* agreed upon by the parties—the invalidity of Plaintiff's 2003 U.S. lawsuit. On April 30, 2004, Mr. Hirota stated: "I hope before above procedure [regarding a possible carveout for Hitachi], your company withdraws the <u>invalid</u> suit raised in America. *See* Hirota Decl. Ex. L (April 30, 2004 Letter from Obayashi to LG) (emphasis added). Plaintiff responded on May 13, 2004: "In addition, for the <u>invalid</u> suit in America, we will withdraw it after we complete the settlement of current issue including Hitachi license matter." *See* Hirota Decl. Ex. M (May 13, 2004 Facsimile from LG Display to Obayashi) (emphasis added).

enforceable contract between the parties. *See* Zeineddin Decl. ¶ 6. As detailed in the Declaration of Mr. Zeineddin, Defendants requested such that LG permit such discovery before filing its motion for partial summary judgment, but that request was denied. *See id*. ¶ 7.

### C. If This Court Does Not Reject Comity Outright, It Should Wait For Japanese Courts To Give The Agreement A Proper Hearing

In Japan, meanwhile, this dispute appears likely to get the full hearing it deserves. More than a year before the present action was filed, Obayashi filed an action in Japan challenging the Korean court's holding that there was a valid agreement between Obayashi and LG. *See* Kobayashi Decl. ¶ 4. Obayashi is arguing in that case that, *inter alia*, no contract was ever formed between the parties, for the same reasons as explained above. *See* Kobayashi Decl. Ex. A at 6-11. And the Japanese court may well find the alleged settlement agreement invalid.

If such a judgment is reached, then it will be a matter of discretion for this Court which judgment to enforce, though enforcing the more recent judgment—in this case the Japanese decision—is the default action. *See* Restatement (Third) of Foreign Relations Law § 482(2)(e); *id.* at cmt. g ("Courts are likely to recognize the later of two inconsistent judgments . . . [but] may recognize the earlier judgment or neither."); *see also Byblos Bank Europe, S.A. v. Syrketi*, 819 N.Y.S.2d 412, 417–18 (N.Y. Sup. Ct. 2006) (applying the Restatement before deciding to exercise its discretion and enforce the earlier decision). So long as the second court considers the preclusive effect of the first court's decision, U.S. courts should generally apply the second court's ruling to the extent it is inconsistent with the first. *See Films by Jove, Inc. v. Berov*, 250 F. Supp. 2d 156, 177 n.26 (E.D.N.Y. 2003).

The Japanese litigation thus affords this Court an opportunity to ensure that fundamental principles of contract law, and not the absence thereof, ultimately decide this dispute. If this

Court does not deny comity outright, then it should deny partial summary judgment until it has the benefit of a Japanese judgment to compare it with.

### D. In Any Case, The Korean Judgment Does Not Address Ownership of the '980 Patent

Even if the Court elects to afford the Korean judgment comity on a summary basis, which would be improper for all of the reasons stated above, the Court cannot extend the Korean judgment to reach ownership of patents that LG chose not to put at issue before the Korean courts. Comity does not permit a United States court to *enlarge* a foreign judgment beyond issues actually litigated before the foreign tribunal. *Hurst v. Socialist People's Libyan Arab Jamahiriya*, 474 F. Supp. 2d 19, 31–32 (D.D.C. 2007). Quite the opposite, "[a] district court . . . may only apply preclusive effect to a judgment if . . . the issue was actually litigated, that is, contested by the parties and submitted for determination by the court." *Id.* (emphasis added); *see also* Restatement (Third) of Foreign Relations Law § 481 cmt. c (1987) ("[A] judgment of a foreign country ordinarily has no greater effect in the United States than in the country where the judgment was rendered."); *Pogostin v. Pato Consol. Gold Dredging, Ltd.*, No. 79 Civ. 5433, 1981 WL 1613, at *5 (S.D.N.Y. Mar. 23, 1981) (refusing to dismiss securities claims relating to a Bermuda judgment because the claims "were neither actually litigated nor necessarily passed upon by the Supreme Court of Bermuda").

LG contends summarily that the Korean judgment adjudicates ownership to all three of the patents at issue in this case. That is not true. The Korean judgment refers only to the patent rights directly associated with 34 patent applications filed in multiple countries. *See* Kim Decl. Ex. D at 20. The applications decided by the Korean judgment are listed in six Annexes appended to the judgment. *Id.* at 21-25. Relevant to this action, the judgment lists three U.S. patent applications: Application Nos. 09/928182, 09/142448, and 10/117754. *Id.* at 22-23. Two

of the patents at issue in this case—patents ‘763 and ‘049—can be traced directly to the Application Nos. listed in the Korean judgment. *See id.* at 22; Plaintiff’s Partial Mot’n Summ. J. at 4 & n.6.[6] The ‘980 patent, however, did not issue from any of the three Application Nos. listed in the Korean judgment. Rather, the ‘980 patent is a “child patent,” specifically a “continuation-in-part,” to the ‘763 patent (meaning that it adds new subject matter to the underlying patent). *See* Hirota Decl. Ex. C. Moreover, the ‘980 Patent was granted on August 29, 2006, *before* LG filed its Korean lawsuit on October 20, 2006, and the patent application from which it directly issued was published by the United States Patent Office on December 4, 2003, *at least three months before* LG and Obayashi ever began their negotiations. *See id.* Thus, LG could have specifically presented the Korean court with the application giving rise to the ‘980 patent if it had wanted an adjudication of the ownership of that patent. Because LG did not raise the ‘980 patent in the Korean proceedings, the Korean judgment did not address it. For that reason alone, Plaintiff’s motion must be denied as to the ‘980 patent.

LG appears to argue that ownership of the ’980 patent is somehow implicitly decided by the Korean judgment. But U.S. courts grant comity to foreign judgments, not the inferences that can be drawn from them.

In any event, it would not be appropriate to infer—particularly at a summary stage and before any discovery has been conducted—that the Korean courts intended to adjudicate ownership of child patents by implication. Indeed, as a matter of Korean law ownership of ‘child patents’ must be addressed explicitly and is not to be presumed from ownership of the parent patent. *See* Kim Decl. ¶ 10.

---

[6] Specifically, it is not disputed that Application No. 09/142,448 issued into patent ‘763, and Application No. 10/117,754 issued into patent ‘049.

U.S. federal law is no different. The Federal Circuit made this clear in *Euclid Chemical Co. v. Vector Corrosion Technologies, Inc.*, 561 F.3d 1340 (Fed. Cir. 2009). *Euclid* involved an assignment transferring ownership of a specific patent, four specific patent applications, as well as all child applications. *Id.* at 1342. In dispute was the ownership of a patent that issued as child from a continuation-in-part of the specific and single patent identified in the assignment. The disputed patent was not specifically identified by the assignment even though it had been issued before the assignment was executed. *Id.* The court held the assignment ambiguous because, although it explicitly included "continuations in part," it did not specifically include the disputed patent, which had already issued at the time of the agreement's execution. *Id.* at 1343-1344.

*Euclid's* analysis would have been unnecessary were it the case, as logically required by Plaintiff's position, that an assignment of a patent, or a judgment awarding the ownership of a patent, automatically also transfers ownership of a child patent. Rather, *Euclid* shows that a court must look to the transferring document itself (there, the assignment; here, the Korean judgment) to determine its effect upon child patents. Moreover, *Euclid* stands for the proposition that, where—as here—a patent is *already* a matter of public record before the transferring document's formation, but is left out of the transferring document, then there is even less basis to assume that that patent is included. *See* Hirota Decl. Ex. C (listing the '980 Patent's filing date as April 19, 2003, and its issuing date as August 29, 2006).

The Korean courts never examined the putative settlement agreement to assess whether ownership of the '980 patent, or any other child patents, should be transferred to LG. If the issue had been raised, the court might have noted the putative settlement agreement's total absence of language as to "continuations-in-part," or anything resembling child patents. Compare this lack

of applicable language with the assignment in *Euclid*, which purported to convey "any and all divisional applications, continuations, and continuations in part" to the relevant patent, and which *still* fell short of clearly transferring the child patents. *Id.* If the assignment in *Euclid* was insufficient, the putative assignment in this case is too.

Thus, it is simply not the case that the transfer of the '763 Patent automatically requires that this Court transfer its continuation-in-part, the '980 Patent. The Korean judgment has no bearing on the '980 Patent, and it therefore provides no basis for this Court to enter judgment as to that patent.

## CONCLUSION

For all of the reasons stated above, Defendants maintain that the Korean judgment is not entitled to comity, and should not be relied upon to change the ownership of the patents at issue. At the very least, the Court should defer consideration of the weight to be given the Korean judgment until the pending Japanese proceedings address the facts that the Korean court did not. Alternatively, Defendants should be given an opportunity to conduct discovery to assess whether enforcement of the Korean judgment in the U.S. could be done consistently with fundamental public policy in the United States and basic notions of justice.

In the event that the Court holds that the Korean judgment is entitled to comity, the Court should only rely on the judgment for the issues it decides. Because the Korean judgment did not address ownership of the '980 patent, this Court must do so independently.

Respectfully submitted

Dated: April 16, 2012

/s/R. Paul Zeineddin
MICHAEL J. BARTA (DC Bar No. 431663)
RYAN E. BULL (DC Bar No. 481743)
R. PAUL ZEINEDDIN (D.C. Bar No. 474734)
ANDREW GEORGE (D.C. Bar No. 988552)
JOSHUA BARRON (D.C. Bar No. 999152)

BAKER BOTTS L.L.P.
1299 Pennsylvania Ave., N.W.
Washington, D.C. 20004-2400
Tel: (202) 639-7700
Fax: (202) 639-7890

*Attorneys for Defendants Obayashi Seikou Co., Ltd., Naoto Hirota, and Sakae Tanaka*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that pursuant to LCvR 5.4, the foregoing Motion was served upon counsel of record automatically via CM/ECF this 16th day of April, 2012.

/s/ Paul Zeineddin
Paul Zeineddin

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| LG DISPLAY CO., LTD.,<br><br>Plaintiff,<br><br>v.<br><br>OBAYASHI SEIKOU CO., LTD.,<br>NAOTO HIROTA, SAKAE TANAKA<br><br>Defendants. | ) | Case Number: 1:11-CV-01637 RLW |

**DEFENDANTS' RESPONSE TO PLAINTIFF'S STATEMENT OF MATERIAL FACT**

MICHAEL J. BARTA (DC Bar No. 431663)
RYAN E. BULL (DC Bar No. 481743)
R. PAUL ZEINEDDIN (D.C. Bar No. 474734)
ANDREW GEORGE (D.C. Bar No. 988552)
JOSHUA BARRON (D.C. Bar No. 999152)

BAKER BOTTS L.L.P.
1299 Pennsylvania Ave., N.W.
Washington, D.C. 20004-2400
Tel: (202) 639-7700
Fax: (202) 639-7890

*Attorneys for Defendants Obayashi Seikou Co., Ltd., Naoto Hirota, and Sakae Tanaka*

Pursuant to Local Rule 7(h)(1), Defendants Obayashi Seikou Co., Ltd. ("Obayashi"), Naoto Hirota ("Hirota"), and Sakae Tanaka ("Tanaka") (together, "Defendants") respectfully submit this statement of issues of material fact and response to Plaintiff LG Display Co., Ltd.'s ("LG") Statement of Material Facts That Are Not In Dispute ("LG's Statement").

**I. Material Facts Not In Dispute That Were Not Raised By LG**

In presenting its Partial Motion for Summary Judgment, LG neglected to bring to the Court's attention issues of material fact that are not in dispute that will guide the Court's decision.

1. The inventions disclosed by the patents-in-suit are not LG employee inventions, as LG admitted in Korea. *See* Declaration of Joon Hyo Kim, April 16, 2012 ("Kim Decl.") ¶ 6; Kim Decl. Ex. B at 264; Declaration of Naoto Hirota ("Hirota Decl.") ¶ 8; Declaration of Sakae Tanaka, April 15, 2012 ("Tanaka Decl.") ¶ 7.

2. The sole basis on which LG sought to enforce the transfer of the patents in Korea was an alleged transfer agreement between Obayashi, Mr. Tanaka, and LG. *See* Kim Decl. ¶ 4.

3. LG asserted to the Korean Courts that the agreement was executed in April 2004. *See* Kim Decl. ¶ 6; Kim Decl. Ex. E (Korean Complaint) at 11.

4. Although Mr. Hirota signed the purported agreement in April 2004, he attached a condition concerning his license with Hitachi. *See* Hirota Decl. ¶ 25; Hirota Decl. Ex. J. LG acknowledged this condition as a "proposal." *See* Hirota Decl. Ex. K.

5. There followed months of negotiations featuring multiple counteroffers by both LG and Mr. Hirota on behalf of Obayashi. *See* Hirota Decl. ¶ 26; Hirota Decl. Exs. L, M, N, O, P, Q.

6. LG also acknowledged ongoing negotiations in a submission to this Court in 2004. *See* Exhibit A (LG's Response to Show Cause Order)

7. On October 11, 2005 LG purported to accept Obayashi's April 2004 counteroffer. *See* Hirota Decl. ¶ 27; Hirota Decl. Ex. R.

8. Litigation is now pending in Japan in Tokyo, Nagoya, and Mito District Courts between Defendants and LG. Declaration of Hideaki Kobayashi ("Kobayashi Decl.") ¶ 3. Defendants are challenging the validity of the purported transfer agreement. *Id.* ¶ 4; Kobayashi Decl. Ex. A at 9–11.

## II. Response to LG's Statement of Material Facts

The numbered paragraphs below correspond to the similarly numbered paragraphs in LG's Statement.

1. Defendants agree that Obayashi is currently listed as the sole assignee of U.S. Patent Nos. 6,288,763 (the "'763 Patent"), 6,999,049 (the "'049 Patent"), and 7,098,980 (the "'980 Patent") (collectively the "patents-in-suit").

2. Defendants agree that Mr. Hirota is currently listed as the sole named inventor of the patents-in-suit.

3. Defendants agree that in early 2003, Obayashi sent a warning letter signed by Mr. Hirota to the predecessor in interest of LG, LG Philips LCD Co., Ltd. (to avoid confusion, LG and its predecessor in interest are both referred to as "LG"). The letter at issue was also an offer to LG to license Mr. Hirota's inventions. *See* Hirota Decl. ¶ 18.

4. Defendants agree that subsequent to Obayashi's early 2003 letter to LG, negotiations ensued between LG, Obayashi, and Mr. Hirota regarding the ownership and rights to inventions, patent applications and issued patents, including the patents-in-suit. But

Defendants disagree with any implication that LG immediately contested ownership of the patents and initiated negotiations directly in response to Obayashi's initial warning letter. Rather, the parties initially negotiated over a potential license agreement for LG to use Mr. Hirota's invention. *See* Hirota Decl. ¶¶ 18, 19; Hirota Decl. Ex. F (July 30, 2003 Letter from Obayashi to LG); Hirota Decl. Ex. G (August 5, 2003 Facsimile from LG to Obayashi). It was not until October 28, 2003, that LG asserted any ownership interest in Mr. Hirota's invention. *See* Hirota Decl. ¶ 20; Hirota Decl. Ex. H (October 28, 2003 Letter from LG to Obayashi).

5. Defendants agree that the dispute between LG and the Defendants led to a lawsuit against Defendants in the Seoul District Central District Court in Seoul, Korea.

6. The Defendants agree that Obayashi and Mr. Tanaka, through their respective counsel, participated in litigation before the Seoul Central District Court, the Seoul High Court, and the Supreme Court of Korea. But Defendants disagree with the assertion that Mr. Hirota participated throughout the entire case in his individual capacity. Although Mr. Hirota was named as a defendant initially and participated in some pretrial hearings, *see, e.g.*, Kim Decl. Ex. B, Mr. Hirota was dropped from the case prior to the Seoul Central District Court reaching its decision, and he is not a party to any Korean judgment. *See* Kim Decl. Ex. C; Kim Decl. Ex. D; LG Partial Mot'n Summ. J., March 21, 2012; Declaration of Sang Chul Jung ("Jung Decl.") Ex. 6E (Translation of Korean Supreme Court Judgment).

7. Defendants do not dispute the accuracy of the docket sheet of the action before the Seoul Central District Court provided by LG.

8. Defendants do not dispute the accuracy of the Ruling of the Seoul Central District Court provided by LG.

9. Defendants do not dispute the accuracy of the docket sheet of the action before the Seoul High Court provided by LG.

10. Defendants do not dispute the accuracy of the Ruling of the Seoul High Court provided by LG.

11. Defendants do not dispute the accuracy of the docket sheet of the action before the Korean Supreme Court provided by LG.

12. Defendants do not dispute the accuracy of the Ruling of the Korean Supreme Court provided by LG.

13. Defendants agree that LG asked the Korean courts to order Obayashi and Mr. Tanaka to transfer numerous rights under numerous patent and patent applications.

14. Defendants agree that among the patents and applications are U.S. Patent Application Nos. 09/142,448 and 10/117,754.

15. Defendants agree that the 09/142,448 application issued into the '763 patent and that the 10/117,754 application issued into the '049 patent. Defendants assert that the '980 patent "is a continuation-in-part of application No. 09/610,815, filed on Jul. 6, 2000, now abandoned, which is a continuation of application No. 09/142,448, filed on Sep. 3, 1998, now U.S. Pat. No. 6,288,763 . . . " *See* Hirota Decl. Ex. C at 1 (emphasis added).

16. Defendants agree that they retained Korean counsel to represent them before the Seoul District Court.

17. Defendants agree that they filed pleadings and evidence before the Seoul District Court.

18. Defendants agree that the Seoul District Court held pre-trial hearings and argument.

19. Defendants agree that on August 23, 2007, the Seoul Central District Court issued its ruling, held in favor of Obayashi and Mr. Hirota, and dismissed the case. However, Defendants disagree that this ruling affected Mr. Hirota in his individual capacity, as he had been dismissed from the case and was no longer a party at this point. *See* Kim Decl. Ex. C.

20. Defendants agree that on September 18, 2007, LG appealed to the Seoul High Court, an intermediate Korean court.

21. Defendants agree that LG provided Obayashi and Mr. Tanaka with the Korean original and a Japanese copy of the request for appeal and pleadings. However, Defendants disagree that these documents were given to Mr. Hirota in his individual capacity, as he had been dismissed from the case and was no longer a party at this point. *See* Kim Decl. Ex. C.

22. Defendants agree that Obayashi and Mr. Tanaka retained the same Korean litigation counsel who represented them before the Seoul Central District Court. However, Defendants disagree that this counsel was retained by Mr. Hirota in his individual capacity, as Mr. Hirota had been dismissed from the case and was no longer a party at this point. *See* Kim Decl. Ex. C.

23. Defendants agree that Obayashi and Mr. Tanaka submitted rebuttals and pleadings to the Seoul High Court. However, Defendants disagree that anything was submitted by Mr. Hirota in his individual capacity, as he had been dismissed from the case and was no longer a party at this point. *See* Kim Decl. Ex. C.

24. Defendants agree that the Seoul High Court held hearings in this case.

25. Defendants agree that on January 30, 2009, the Seoul High Court reversed the Seoul District Court's decision.

26. Defendants agree that the Seoul High Court ruled that it had jurisdiction over the matter, and that the Seoul High Court ordered Obayashi and Mr. Tanaka to transfer rights under the patents and applications in the Korean litigation. Defendants agree that the Court ordered Obayashi and Mr. Tanaka to transfer the '749 Patent and the '049 Patent, but disagree that the Seoul High Court ordered them to transfer the '980 Patent. *See* Kim Decl. Ex. D at 5, 22. Further, Defendants disagree that the Seoul High Court ordered Mr. Hirota to do anything in his individual capacity, as Mr. Hirota had been dismissed from the case and was no longer a party at this point. *See* Kim Decl. Ex. D.

27. Defendants agree that the Seoul High Court ordered Obayashi and Mr. Tanaka to register and report the transfer of rights. However, Defendants disagree that the Seoul High Court ordered Mr. Hirota to do anything in his individual capacity, as Mr. Hirota had been dismissed from the case and was no longer a party at this point. *See* Kim Decl. Ex. D.

28. Defendants agree that on February 9, 2009, Obayashi and Mr. Tanaka appealed to the Supreme Court of the Republic of Korea. Defendants disagree that Mr. Hirota made any appeal in his individual capacity, as Mr. Hirota had been dismissed from the case and was no longer a party at this point. *See* Kim Decl. Ex. D.

29. Defendants agree that Obayashi and Mr. Tanaka were represented before the Korean Supreme Court by their original counsel as well as counsel from two other Korean law firms. Defendants disagree that Mr. Hirota was represented by anyone in his individual capacity, as Mr. Hirota had been dismissed from the case and was no longer a party at this point. *See* Jung Decl. Ex. 6E.

30. Defendants agree that before the Korean Supreme Court, Obayashi and Mr. Tanaka submitted briefs and documents. Defendants disagree that Mr. Hirota submitted

anything to the court in his individual capacity, as Mr. Hirota had been dismissed from the case and was no longer a party at this point. *See* Jung Decl. Ex. 6E.

31. Defendants agree that on April 28, 2011, the Korean Supreme Court dismissed Obayashi and Mr. Tanaka's appeal. Defendants disagree that the Korean Supreme Court dismissed the appeal of Mr. Hirota in his individual capacity, as Mr. Hirota had been dismissed from the case and was no longer a party at this point. *See* Jung Decl. Ex. 6E.

32. Defendants agree that the Korean Supreme Court ruled in favor of LG, against Obayashi and Mr. Tanaka, and affirmed the Seoul High Court's decision on both the issues of jurisdiction and patent ownership. Defendants disagree with LG's assertion that the Korean Supreme Court ruled against Mr. Hirota in his individual capacity, as Mr. Hirota had been dismissed from the case and was no longer a party at this point. *See* Jung Decl. Ex. 6E.

33. Defendants agree that LG presented the Korean judgment to the Korean Intellectual Property Office which then enforced the Korean final judgment by registering LG as the rights holder to certain Korean patents that Obayashi and Mr. Tanaka were ordered to transfer. Defendants disagree with LG's assertion that Mr. Hirota was ordered to transfer anything in his individual capacity, as Mr. Hirota had been dismissed from the case and was no longer a party at this point. *See* Jung Decl. Ex. 6E.

34. The Defendants disagree that the High Court stated anything about equivalency, *See* Kim Decl. Ex. D at 5, 22. The Defendants admit that the '763 and '049 Patents are mentioned in Appendix 2 of the opinion, *see id.* at 22, but deny that the '980 Patent is mentioned anywhere in the Korean judgments or decisions. *See id.*

Respectfully submitted,

Dated: April 16, 2012

/s/R. Paul Zeineddin
MICHAEL J. BARTA (DC Bar No. 431663)
RYAN E. BULL (DC Bar No. 481743)
R. PAUL ZEINEDDIN (D.C. Bar No. 474734)
ANDREW GEORGE (D.C. Bar No. 988552)
JOSHUA BARRON (D.C. Bar No. 999152)

BAKER BOTTS L.L.P.
1299 Pennsylvania Ave., N.W.
Washington, D.C. 20004-2400
Tel: (202) 639-7700
Fax: (202) 639-7890

*Attorneys for Defendants Obayashi Seikou Co., Ltd., Naoto Hirota, and Sakae Tanaka*