**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | | |
|---|---|---|---|
| LG DISPLAY CO. LTD., | : | | |
| | : | | |
| Plaintiff, | : | Civil Action No.: | 11–1637 (RC) |
| | : | | |
| v. | : | Re Documents No.: | 18, 22 |
| | : | | |
| OBAYASHI SEIKOU CO., LTD. *et al.*, | : | | |
| | : | | |
| Defendants. | : | | |

<u>**MEMORANDUM OPINION**</u>

**Granting in Part and Denying in Part the Plaintiff's Motion for Partial Summary Judgment; Granting Defendant Sakae Tanaka's Motion to Dismiss for Lack of Personal Jurisdiction; Denying without Prejudice the Defendants' Contingent Motion to Dismiss Counts V–VII**

## I. INTRODUCTION

The parties have been litigating this patent dispute for the better part of a decade. LG Display, Co., Inc. ("LG") alleges that Sakae Tanaka, one of its former employees, stole its proprietary information and passed it along to a third party, Naoto Hirota. LG alleges that Hirota then used the stolen technology to obtain several patents. The parties entered into a settlement agreement, but their discussions soon fell apart. LG brought suit in South Korea, eventually scoring a win in that country's highest court of appeal. LG then filed suit here, asking this court to recognize the Korean judgment. In addition, LG brings various common-law claims against the defendants for their alleged theft of LG's intellectual property.

Now before the court are several motions. LG moved for partial summary judgment, arguing that this court should recognize the Korean Supreme Court's judgment. In addition, one of the defendants—Sakae Tanaka—asked to be dismissed from this case for lack of personal jurisdiction. Finally, the defendants moved to dismiss several counts under the doctrine of *forum non conveniens*. For the reasons explained below, the court will grant in part and deny in part

LG's motion, grant defendant Tanaka's motion to dismiss for lack of personal jurisdiction, and deny the defendants' contingent motion to dismiss.

## II. FACTUAL ALLEGATIONS AND PROCEDURAL BACKGROUND

### A. The Parties and the Patents

Three U.S. patents lie at the heart of this suit.[1]  The plaintiff, LG, is a South Korean company that researches, develops, manufactures, and sells LCD panels.  Compl. ¶ 1.  Defendant Sakae Tanaka is a former LG employee.  *Id.* ¶ 7.  He is a citizen of Japan who has lived, on occasion, in South Korea.[2]  *Id.*  Defendant Naoto Hirota is also a citizen of Japan.  He is the president of a Japanese company, Obayashi Seikou Co., Ltd. ("Obayashi Co."), which currently owns the patents at issue.  *Id.* ¶¶ 5–7.

LG claims that Tanaka misappropriated its trade secrets during his employment with the company.  *Id.* ¶¶ 8–9, 18.  LG alleges that Tanaka then passed the stolen information along to Hirota, who used the material to apply for various patents in the U.S. and abroad.  *Id.* ¶¶ 26–28.  Hirota maintains that he invented the patented technology without Tanaka's assistance.  Defs.' Opp'n, Ex. 8 (Hirota Decl.) ¶¶ 8, 16–17.

### B. Threats, Negotiations, and the April 2004 Settlement Agreement

The dispute began in early 2003.  Hirota sent a warning letter to LG, threatening to sue the company for patent infringement and offering to resolve the dispute with a licensing

---

[1]  U.S. Patent Nos. 6,288,763 ("the '763 patent"), 6,999,049 ("the '049 patent"), and 7,098,980 ("the '980 patent").  Pl.'s Stmt. of Facts ¶ 1.  Although the Korean judgment included a large number of patents, many of which were issued in other countries, this suit only involves the three U.S. patents listed above.  *See* Pl.'s Mot. at 6.

[2]  *See* Pl.'s Mot., Ex. 11 (Korean Supreme Court ruling) (noting that "Sakae Tanaka appears to have resided in Korea during the district court trial"); Tanaka's Answer ¶ 7 ("Defendant Tanaka admits that he is a citizen of Japan, that he is a former employee of LG Electronics, that he maintains a temporary residence in Suwon, Korea, and that he has a permanent place of residence [in Japan].").

agreement.  Hirota Decl. ¶ 18; *id.*, Ex. D ("Please look at your liquid crystal display under a 100x

magnifying lens.  If the electrode is curved in a zigzag pattern, it is in conflict with the patent of

our company. . . .  If no response has been received by the end of this month, a claim for loss, or

in the worst case, an injunction may be demanded and it could lead to a situation where your

company may no longer be able to produce and sell LCDs in Japan, Taiwan, South Korea, and

the United States.").  Hirota sent similar letters to other companies in the field, including Hitachi,

Sony, Samsung and NEC.  Hirota Decl. ¶ 18.  Hitachi chose to enter into a licensing arrangement

with Hirota, under which Hitachi agreed to pay approximately $5–6 million in exchange for the

right to use the patented technology.  *See* Hirota Decl. ¶ 18; *id.*, Ex. E (Hitachi License

Agreement).  LG took a different tack.  In a warning letter of its own, LG accused Tanaka of

stealing LG's technology and demanded that Hirota transfer ownership of the patents to LG.  *See*

Hirota Decl. ¶ 20; *id.*, Ex. H ("[A]ll of [these] patents your company holds are the inventions

related to the work of Mr. [Sakae] Tanaka's who was an employee of our company, and should

belong to our company.").[3]

There is some disagreement as to what occurred next.  In March 2004, LG sent Hirota a

draft settlement agreement, under which the defendants would ostensibly transfer its LCD-

related patent rights to LG.  Hirota Decl., Ex. I.  The agreement was signed by Tanaka and

Obayashi Co.'s attorney on April 3, 2004.  Hirota Decl. ¶ 25.[4]  That same day, Hirota sent LG a

fax indicating that he wanted to add one condition: namely, Hirota wished to leave the Hitachi

---

[3]     LG also filed suit against Obayashi Co. in this court to challenge the validity and enforceability of Obayashi Co.'s patents.  *See generally* Civil Action No. 03-2658 (RCL).  After several months, LG voluntarily withdrew the suit, citing ongoing settlement negotiations.

[4]     According to Korea's Supreme Court, "[the] agreement transfers the following patents from the defendants to the plaintiffs free of charge."  Pl.'s Mot. Ex. 11, at 3.  Hirota explains that he did so because he "could not afford to fight [LG's] lawyers."  Hirota Decl. ¶ 24.

licensing agreement undisturbed.  *See* Hirota Decl., Ex. J ("I want to accept your all proposal [sic] except one item.").  LG appears to have interpreted this as a partial acceptance of its settlement offer.  Hirota Decl., Ex. K ("[T]hank you for your acceptance and proposal.").  But the Hitachi agreement proved to be a bone of contention, and the parties never resolved the issue.  *See* Hirota Decl., Exs. L–O (correspondence back and forth on the Hitachi issue).

### C. The Korean Litigation

After negotiations broke down, LG filed suit in South Korea.[5]  Defs.' Opp'n, Ex. 27 (Kim. Decl.) ¶¶ 4–5.  The legal dispute was narrow: the court confined its analysis to the question of whether the April 2004 settlement agreement was valid.  *See generally* Pl.'s Mot., Ex. 11.  The court did not rule on any of the underlying issues—*i.e.*, who actually invented the technology, whether Tanaka stole LG's trade secrets, or whether the underlying patents were valid.  *Id.* at 3 (noting that "the main object of dispute and deliberation is merely the interpretation and determination of the validity of the present assignment agreement"); Kim Decl. ¶ 4 ("At all levels of the Korean Litigation . . . the only reason the Courts awarded LG Display ownership of the patents-in-suit was the alleged existence of a settlement contract between Obayashi, Mr. Tanaka and LG Display").  LG argued that the defendants had contractually agreed to transfer their patent rights to LG.  The defendants argued that the settlement agreement was the product of unlawful coercion and/or material mistake.  *Id.* ¶ 5.

LG emphasizes that the Korean litigation was exhaustive:  "[Obayashi Co.] submitted eleven (11), fifteen (15), and forty (40) items of documentary evidence to the Seoul Central District Court, Seoul High Court, and the Supreme Court of the Republic of Korea, respectively."  Pl.'s Reply 8–9.  The defendants won at the trial level, but lost in the court of

---

[5]      The settlement agreement listed the Seoul Central District Court in its forum selection clause. Kim Decl. ¶ 4.

intermediate appeals.  Pl.'s Stmt. of Facts. ¶¶ 19, 29, 32.  The defendants then appealed to the

Supreme Court, which ruled in favor of LG.  *See generally* Pl.'s Mot., Ex. 11 (Korean Supreme

Court ruling).  The court ruled that the April 2004 settlement agreement was valid, and that the

defendants were required to transfer their patent rights to LG.  *See* Defs.' Opp'n at 4.  The

defendants have not yet done so.

### D. The Japanese Litigation

After the Korean judgment was issued, LG filed three separate lawsuits in Japan.

Although details are lacking, it appears that LG sued to enforce the Korean judgment insofar as it

pertains to patents registered in Japan.  Pl.'s Reply at 5, n.6.; *id.*, Ex. 8 (Furuta Decl.) ¶ 9.  It

remains unclear when the Japanese courts will eventually issue their rulings.  Furuta Decl. ¶ 12;

Defs.' Opp'n, Ex. 37 (Kobayashi Decl.) ¶ 6 ("I expect that the Tokyo court will render final

judgment in Defendant's case before the end of 2012.").

### E. The Current Lawsuit

LG's complaint lists seven counts:  Count I (Correction of Inventorship under 35 U.S.C.

§ 256) asks the court for an order directing the U.S. Patent and Trademark Office to recognize

that LG is the rightful inventor of the contested patents.  Count II (Enforcement of Korean

Judgment) asks the court to issue an order recognizing the Korean judgment, which would

require the defendants to transfer their patent rights to LG.  Count III (Declaratory Judgment)

seeks a declaratory judgment stating that LG is the rightful owner of the patents.  Count IV

(Promissory Estoppel) claims that the defendants made a promise during the 2003 litigation:

namely, that they would transfer their patent rights to LG.  LG claims that the defendants should

be held to that promise.  Count V (Misappropriation of Trade Secrets) seeks damages for

Tanaka's unlawful acquisition and disclosure of LG's trade secrets.  Count VI (Conversion)

seeks compensation for the defendants' unlawful conversion of LG's intellectual property.

5

Finally, Count VII (Unjust Enrichment) asks the court to reward LG for any financial gains that the defendants obtained through their unlawful use of the contested patents.

A bevy of motions is now before the court.  In their opposition to LG's motion for partial summary judgment, the defendants argue that this case should be stayed pending litigation that is currently underway in Japan.  *See* Defs.' Opp'n at 20.  The court will deny this request.  Tanaka, a citizen of Japan, argues that this court has no jurisdiction over him, as he lacks minimum contacts with this forum.  The court will grant his motion to dismiss.  LG moved for partial summary judgment on Count II, which asks the court to recognize the Korean judgment under the doctrine of comity.  For reasons discussed below, this motion will be granted in part and denied in part.  Finally, the defendants moved for dismissal of Counts V, VI and VII under the doctrine of *forum non conveniens*.  The court will deny this motion without prejudice.

## III. ANALYSIS

### A. The Court Declines the Defendants' Request to Stay All Proceedings Pending an Outcome in the Japanese Litigation[6]

This court has the discretionary power to stay this action pending the outcome of foreign litigation.  This authority is "incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants."  *Ronar, Inc. v. Wallace*, 649 F. Supp. 310, 318 (S.D.N.Y. 1986) (citing *Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936) (Cardozo, J.)).  "For the most part," however, "federal courts are reluctant to decline jurisdiction solely on the basis of concurrent proceedings in another jurisdiction."  *Christ v. Cormick*, 2007 WL 2022053, at *7 (D. Del. July 10, 2007)

---

[6] Pursuant to the parties' joint motion, discovery was stayed pending the court's resolution of the parties' motions.  The court will issue an order lifting that stay in the near future.  Here, the defendants appear to request another stay that would presumably last until the Japanese litigation runs its course.  The court will deny this request.

(citing *Evergreen Marine Corp. v. Welgrow Int'l Inc.*, 942 F. Supp. 201, 207 (S.D.N.Y. 1996));

*see also Laker Airways Ltd. v. Sabena, Belgian World Airlines*, 731 F.2d 909, 926 (D.C. Cir.

1984) ("[P]arallel proceedings on the same *in personam* claim should ordinarily be allowed to

proceed simultaneously."); *Finova Capital Corp. v. Ryan Helicopters, U.S.A. Inc.*, 180 F.3d 896,

898 (7th Cir. 1999) (recognizing limited circumstances in which a federal court should, in its

discretion, refrain from the exercise of its "virtually unflagging obligation" to exercise

jurisdiction) (citing *Colo. River Water Constr. Dist. v. United States*, 424 U.S. 800, 817 (1976)).

When deciding whether to stay a proceeding due to parallel litigation abroad, the court's

analysis "does not rest on a mechanical checklist, but on a careful balancing of the important

factors . . . as they apply in a given case, with the balance heavily weighted in favor of the

exercise of jurisdiction." *Royal & Sun Alliance Ins. Co. of Can. v. Century Intern. Arms, Inc.*,

466 F.3d 88, 94 (2d Cir. 2006) (citing *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*,

460 U.S. 1, 16 (1983)).  Instead, a district court should be guided by essentially "pragmatic

concerns," *Wallace*, 649 F. Supp. at 318, which include the "proper respect for litigation in and

the courts of a sovereign nation, fairness to litigants, and judicial efficiency," *Royal & Sun

Alliance*, 466 F.3d at 94.  Thus, courts have considered a litany of factors, including "the

similarity of the issues, the order in which the actions were filed, the adequacy of the alternate

forum, the potential prejudice to either party, the convenience of the parties, the connection

between the litigation and the United States, and the connection between the litigation and the

foreign jurisdiction."  *Royal & Sun Alliance*, 466 F.3d at 94; *see Mut. Serv. Ins. Co. v. Frit

Indus., Inc.*, 358 F.3d 1312, 1324 (11th Cir. 2004); *Finova Capital Corp.*, 180 F.3d at 898.

The defendants argue that this action should be stayed pending certain lawsuits that are

currently percolating through Japan's legal system.  *See* Defs.' Opp'n at 20–21.  The defendants

do not describe the subject of this litigation with much detail:  "Currently Obayashi and LG are litigating many of the same issues presented here in the Tokyo, Nagoya, and Mito District Courts in Japan.  In one of these cases, the Tokyo case, Obayashi and LG dispute the purported settlement agreement.  The Tokyo case features the argument that the purported settlement agreement was never a duly executed contract."  Defs.' Opp'n at 9.  LG fleshes the issue out somewhat, explaining that these lawsuits only concern the rights to Japanese patents—not the U.S. patents at issue here.  Pl.'s Reply at 5, n.6.; *see id.*, Ex. 8 (Furuta Decl.) ¶ 9.  LG asserts that two of the three lawsuits are enforcement actions, meaning that they are merely trying to enforce the Korean judgment in Japan inasmuch as it pertains to Japanese patents.[7]  In the third action, the parties appear to be embroiled in a dispute of whether the Korean court had jurisdiction to rule on the ownership of Japanese patents.  Furuta Decl. ¶ 11.  In all, there is no evidence suggesting that the Japanese litigation concerns the three U.S. patents at the heart of this suit.

LG also notes that the timeline for this litigation is uncertain at best:  "It is difficult to predict with any precision when the Courts in the above actions will enter final decisions on the issues before them.  Whenever the Japanese courts decide those issues at the trial stage, the decisions will be subject to appellate review by the Tokyo/Nagoya High courts, and further review by the Supreme Court of Japan."  *Id.* ¶ 12; Defs.' Opp'n, Ex. 37 (Kobayashi Decl.) ¶ 6 ("I expect that the Tokyo court will render final judgment in Defendant's case before the end of 2012.").

The defendants note that the Japanese litigation was filed before this lawsuit, which might ordinarily weigh towards staying this action.  *Supermicro Computer, Inc. v. Digitechnic, S.A.*, 145 F. Supp. 2d 1147, 1149 (N.D. Cal. 2001) ("In short, the doctrine [of international

---

[7]    Thus, it appears that those lawsuits are analogous to this one, except that they pertain to Japanese patents.

abstention] allows a court to abstain from hearing an action if there is a first-filed foreign proceeding elsewhere."); *Ermenegildo Zegna Corp. v. Lanificio Mario Zegna S.p.A.*, 1996 WL 721079, at \*4 (S.D.N.Y. Dec. 13, 1996).  But LG points out that the Japanese lawsuits concern a different subject entirely: this lawsuit concerns U.S. patents; those lawsuits concern Japanese patents.  And if "the foreign proceeding will not resolve all the issues presented in the federal action, a federal district court need not stay the action pending resolution of the foreign proceeding." *Modern Computer Corp. v. Ma*, 862 F. Supp. 938, 949 (E.D.N.Y. 1994); *Herbstein v. Bruetman*, 743 F. Supp. 184, 190 (S.D.N.Y. 1990) (concluding that motions to stay should be denied if the foreign litigation involves non-identical claims).  Finally, the Japanese litigation does not appear to have reached its conclusion.  "Where foreign litigation is in its incipiency, motions to stay the domestic action are properly denied." *Brinco Mining Ltd. v. Fed. Ins. Co.*, 552 F. Supp. 1233, 1241 (D.D.C. 1982) (quoting *I.J.A., Inc. v. Marine Holdings*, 524 F. Supp. 197, 199 (E.D. Pa. 1981)).  In sum, the court concludes that this matter should not be stayed on account of the Japanese litigation.

### B. The Court Will Grant Tanaka's Rule 12(b)(2) Motion to Dismiss

### 1. Legal Standard for a Motion to Dismiss Under Rule 12(b)(2)

The plaintiff bears the burden of establishing personal jurisdiction over each defendant. *Crane v. N.Y. Zoological Soc'y*, 894 F.2d 454, 456 (D.C. Cir. 1990).  On a motion to dismiss for lack of personal jurisdiction, a court may consider evidence outside of the pleadings.  *See Mwani v. Bin Laden*, 417 F.3d 1, 7 (D.C. Cir. 2005).  Although the court must resolve any factual discrepancies in favor of the plaintiff, *Crane*, 894 F.2d at 456, "[b]are allegations and conclusory statements are insufficient."  *Johns v. Newsmax Media, Inc.*, 2012 WL 3637147, at \*2 (D.D.C. Aug. 24, 2012); *see Second Amendment Found. v. U.S. Conference of Mayors*, 274 F.3d 521, 524 (D.C. Cir. 2001).

### 2. The Court Lacks Personal Jurisdiction over Tanaka

In a federal question case,[8] the plaintiff must establish two elements before the court may exercise personal jurisdiction over a defendant: (1) that haling the defendant into court accords with the Fifth Amendment's Due Process Clause; and (2) that the defendant is amenable to service of process from the court. *In re Vitamins Antitrust Litig.*, 2001 WL 855469, at *2 (D.D.C. July 2, 2001) (quoting *Perry v. Delaney*, 5 F. Supp. 2d 617, 619 (C.D. Ill. 1998)); *see generally Omni Capital Intern., Ltd. v. Rudolf Wolff & Co.*, 484 U.S. 97 (1987). Here, service of process was effected through the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents, *see* Docket No. 4, to which Tanaka does not object, *see* Docket No. 7. Rather, he argues that the exercise of personal jurisdiction would offend constitutional notions of due process, as he lacks sufficient contacts with the District of Columbia.[9]

The exercise of personal jurisdiction over a defendant is consistent with the U.S. Constitution if the defendant has sufficient contacts with the United States as a whole. *Mwani v. Bin Laden*, 417 F.3d at 7; *see Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (noting that "the constitutional touchstone remains whether the defendant purposefully established 'minimum contacts'" (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945))). Thus, the defendant must

---

[8] LG seeks relief under various federal patent statutes, and subject-matter jurisdiction therefore exists under 28 U.S.C. § 1331 (federal question jurisdiction) and § 1338(a) (original jurisdiction for patent claims).

[9] The court notes that Tanaka did not apply for the three U.S. patents at the heart of this suit. If that were so, personal jurisdiction would likely exist under a separate federal long-arm statute for patent cases. *See* 35 U.S.C. § 293; *Nat'l Patent Dev. Corp. v. T.J. Smith & Nephew Ltd.*, 877 F.2d 1003, 1009–10 (D.C. Cir. 1989) (en banc) (R.B. Ginsburg, J.) ("By registering a patent in the United States Patent Office, a party residing abroad purposefully avails itself of the benefits and protections patent registration in this country affords."). Because the federal patent long-arm statute does not apply to Tanaka, the court must apply the usual analysis and determine whether Tanaka has "minimum contacts" with the United States.

have a sufficient "connection with the forum . . . such that the defendant should reasonably anticipate being haled into court there." *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 295 (1980).

The constitutional limits of due process are generally coterminous with those limits set forth in the District of Columbia's long-arm statute. *Harris v. Omelon*, 985 A.2d 1103, 1105 n.1 (D.C. 2009); *Helmer v. Doletskaya*, 393 F.3d 201, 205 (D.C. Cir. 2004); *see generally* D.C. CODE § 13-423. Accordingly, the court's exercise of personal jurisdiction passes constitutional muster as long as the defendant has committed one of the acts listed in the long-arm statute.[10] *United States v. Ferrara*, 54 F.3d 825, 828 (D.C. Cir. 1995) (noting that "the statutory and constitutional jurisdictional questions, which are usually distinct, merge into a single inquiry").

LG argues that personal jurisdiction exists under § 13-423(a)(4), which provides that personal jurisdiction exists "as to a claim for relief arising from the person's . . . causing tortious injury in the District of Columbia by an act or omission *outside* the District of Columbia." D.C. CODE § 13-423(a)(4) (emphasis added). But jurisdiction exists only if the defendant also "regularly does or solicits business, engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in the District of Columbia." *Id.* LG claims that Tanaka engaged in a "persistent course of conduct" in the District of Columbia by frequently appearing before the U.S. Patent and Trademark Office to apply for various other patents that are not involved in this suit. Pl.'s Opp'n at at 9. "[B]y applying for dozens of patents before the USPTO," LG concludes, "Tanaka purposefully availed himself of the benefits and protections patent registration in this country affords." *Id.* at 10.

---

[10]    Although some courts have noted that the long-arm statute and the Constitution do not overlap perfectly, *see Mwani v. Bin Laden*, 417 F.3d at 9; *Lewy v. S. Poverty Law Ctr., Inc.*, 723 F. Supp. 2d 116, 124 n.4 (D.D.C. 2010), the analysis below reveals that Tanaka has *no* relevant contacts with this forum. Accordingly, personal jurisdiction is lacking under any measure.

This argument suffers from two major flaws.  First of all, LG does not articulate what injury it actually suffered in the District of Columbia.  LG simply states that "tortious injury" occurred in the District when Hirota and Obayashi allegedly applied for the patents with the U.S. Patent and Trademark Office.  But the relevant injury for patent cases normally refers to patent infringement, and LG does not allege that any patent infringement occurred in the District.  *Cf. Medical Solutions, Inc. v. C Change Surgical LLC*, 541 F.3d 1136, 1139–40 (Fed. Cir. 2008). But even if the court assumed that some injury occurred in the District, LG's argument is foreclosed by the "government contacts" doctrine.  Under this principle, "mere entry [into the District of Columbia] by non-residents for the purpose of contacting federal government agencies cannot serve as a basis for in personam jurisdiction," *Rose v. Silver*, 394 A.2d 1368, 1370 (D.C. 1978); *see Naartex Consulting Corp. v. Watt*, 722 F.2d 779, 787 (D.C. Cir. 1983); *Mallinckrodt Med., Inc. v. Sonus Pharm., Inc.*, 989 F. Supp. 265, 271 (D.D.C. 1998).  Stated simply, a party's contacts with government agencies do not enter the jurisdictional calculus. *Chrysler Corp. v. Gen. Motors Corp.*, 589 F. Supp. 1182, 1196 (D.D.C. 1984).  Thus, Tanaka did not make any meaningful contact with the District of Columbia by submitting patent applications with the U.S. Patent and Trademark Office.  *See Stabilierungsfonds fur Wein v. Kaiser Stuhl Wine Distribs. Pty. Ltd.*, 647 F.2d 200, 205 n.11 (D.C. Cir. 1981) (concluding that the "government contacts" exception applies to a foreign corporation's trademark registration activities); *Freiman v. Lazur*, 925 F. Supp. 14, 24 (D.D.C. 1996) (noting that the government contacts doctrine prevented the exercise of personal jurisdiction when the defendant applied to register a copyright with the U.S. Copyright Office in Washington, D.C.); *Am. Std., Inc. v. Sanitary Wares Mfg. Corp.*, 1987 WL 19224, at *3 (D.D.C. June 30, 1987) (defendant's application for a registration with the Commissioner of Patents & Trademarks, was not a valid

basis for personal jurisdiction, as "personal jurisdiction may not be based solely upon contacts with the federal government"). Accordingly, LG's argument must be rejected.[11]

LG also argues that personal jurisdiction exists under section 13-423(a)(3), which confers jurisdiction over a person who causes "tortious injury in the District of Columbia by an act or omission *in* the District of Columbia." D.C. CODE § 13-423(a)(3) (emphasis added). LG maintains that personal jurisdiction exists under this section by virtue of "conspiracy jurisdiction." To explain, LG argues that Tanaka and Hirota are co-conspirators, and that each individual is the other's agent. If so, personal jurisdiction could be asserted over Tanaka as long as his co-conspirator, Hirota, committed an act in the District that caused tortious injury in the District. *See Edmond v. U.S. Postal Serv. Gen. Counsel*, 949 F.2d 415, 424–25 (D.C. Cir. 1991).

Again, the court will reject this argument for two reasons. First, LG did not adequately allege conspiracy jurisdiction in its complaint. In order "to establish jurisdiction under a theory of civil conspiracy, the plaintiff must plead with particularity overt acts within the forum taken in furtherance of the conspiracy." *World Wide Minerals v. Republic of Kazakhstan*, 296 F.3d 1154, 1168 (D.C. Cir. 2002). Here, LG plaintiff makes no mention of conspiracy in its complaint, and it is doubtful whether the facts alleged therein might support the inference that a conspiracy existed. But even if conspiracy jurisdiction had been satisfactorily alleged, LG's second argument suffers from the same basic infirmity as the first. LG argues that Hirota submitted to the jurisdiction of this court by submitting several patent applications with the U.S. Patent and Trademark Office. For the reasons explained above, however, these acts do "not enter the calculus of minimum contacts with the District of Columbia for jurisdictional purposes."

---

[11]     Even if the "government contacts" doctrine did not apply, the court doubts that Tanaka has any contacts with the District of Columbia. The U.S. Patent and Trademark Office is located in Virginia.

*Chrysler Corp. v. Gen. Motors Corp.*, 589 F. Supp. 1182, 1196 (D.D.C. 1984).  Accordingly, the court will grant Tanaka's motion to dismiss for lack of personal jurisdiction.

### C. The Court Will Grant in Part and Deny in Part LG's Motion for Partial Summary Judgment in Part

#### 1. Legal Standard for Recognition of a Foreign Judgment Under the Doctrine of Comity

International comity is a "doctrine of deference based on respect for the judicial decisions of foreign sovereigns."  *United States v. Kashamu*, 656 F.3d 679, 683 (7th Cir. 2011) (Posner, J.).  It provides that a U.S. court should give full effect to a foreign judgment entered with impartiality and due process.  *Hilton v. Guyot*, 159 U.S. 113, 158–159, 168 (1895); *Doe v. Exxon Mobil Corp.*, 654 F.3d 11, 64 (D.C. Cir. 2011) (citing *Hilton*, 159 U.S. at 202–03).  Comity fosters international cooperation and encourages reciprocal recognition of our judgments elsewhere.  *See Oetjen v. Central Leather Co.*, 246 U.S. 297, 304 (1918) ("To permit the validity of the acts of one sovereign State to be reexamined and perhaps condemned by the courts of another would very certainly imperil the amicable relations between governments and vex the peace of nations.").  Thus, the doctrine is accurately characterized as a "golden rule among nations—that each must give the respect to the laws, policies, and interests of others that it would have others give to its own in the same or similar circumstances."  *Mich. Cmty. Servs., Inc. v. NLRB*, 309 F.3d 348, 356 (6th Cir. 2002) (quoting Black's Law Dictionary).[12]

The doctrine of comity cannot be reduced to a precise formula, as it "summarizes in a brief word a complex and elusive concept."  *Laker Airways, Ltd. v. Sabena, Belgian World*

---

[12]   If the Korean judgment specified a monetary sum, a separate D.C. statute that governs the recognition of money judgments might apply.  *See generally* D.C. CODE § 15-364; *Sea Search Armada v. Republic of Colombia*, 821 F. Supp. 2d 268, 274 (D.D.C. 2011).  And if this statute applied, the defendants would almost certainly lose.  *Soc'y of Lloyd's v. Siemon-Netto*, 457 F.3d 94, 100 (D.C. Cir. 2006) (concluding that contract proceedings abroad are resistant to challenges based on the notion that they are repugnant to public policy).

*Airlines*, 731 F.2d 909, 937 (D.C. Cir. 1984); *see also United States v. Nippon Paper Indus.*, 109

F.3d 1, 8 (1st Cir. 1997) ("Comity is more an aspiration than a fixed rule, more a matter of grace

than a matter of obligation.").  Precedent nevertheless sheds some light on the doctrine's

contours.  U.S. courts should generally recognize foreign judgments if:

> [T]here has been opportunity for a full and fair trial abroad before a court of
> competent jurisdiction, conducting the trial upon regular proceedings, after due
> citation or voluntary appearance of the defendant, and under a system of
> jurisprudence likely to secure an impartial administration of justice between the
> citizens of its own country and those of other countries, and there is nothing to
> show either prejudice in the court, or in the system of laws under which it was
> sitting, or fraud in procuring the judgment.

*Hilton*, 159 U.S. at 158.  The Supreme Court has emphasized that "the merits of the case should

not, in an action brought in this country upon the judgment, be tried afresh, as on a new trial or

on appeal," and that the "mere assertion of the party that the judgment was erroneous in law or in

fact" should not suffice to controvert the foreign court's judgment.  *Medellin v. Dretke*, 544 U.S.

660, 670 (2005) (quoting *Hilton*, 159 U.S. at 158).  Additionally, differences between legal

systems will not, by themselves, warrant a denial of comity.  *Sarl Louis Feraud Intern. v.*

*Viewfinder, Inc.*, 489 F.3d 474, 479 (2d Cir. 2007) ("[I]t is well established that mere divergence

from American procedure does not render a foreign judgment unenforceable.") (quoting *Pariente*

*v. Scott Meredith Literary Agency, Inc.*, 771 F. Supp. 609, 616 (S.D.N.Y. 1991)); *see also Loucks*

*v. Std. Oil Co.*, 120 N.E. 198, 201 (N.Y. 1918) (Cardozo, J.) ("We are not so provincial as to say

that every solution of a problem is wrong because we deal with it otherwise at home.").

## 2. The Court Recognizes the Korean Judgment Under the Doctrine of Comity

LG asks the court to recognize the Korean judgment under the doctrine of comity and

order the defendants to turn over possession of the U.S. patents.  The defendants counter that the

Korean judgment does not deserve comity because it violates "universal contract principles."

Defs.' Opp'n at 15–20.  The defendants' argument proceeds along these lines:  In March 2004,

LG sent Hirota a draft settlement agreement.  Defs.' Opp'n, Ex. 8 (Hirota Decl.), Ex. I.  Hirota's

attorney signed the agreement on April 3, 2004.  Hirota Decl. ¶ 25.  Hirota purportedly attached

one condition, however: he wished to maintain his licensing agreement with Hitachi.[13]  *See*

Hirota Decl. Ex. J ("I want to accept your all proposal [sic] except one item.").  Although LG

appears to have interpreted this as a partial acceptance of its offer, Hirota Decl. Ex. K, the parties

still disagreed on the Hitachi licensing issue.  *See* Hirota Decl. Exs. L–O.  Some time passed, and

Hirota "figured the issue had gone away."  Hirota Decl. ¶ 28.  He claims to have been caught off

guard when LG brought suit under the April 2004 settlement agreement.  *Id.*

 The defendants characterize Hirota's April 2004 response as a "conditional reply; *i.e.*, a

rejection and a counteroffer."  And it is hornbook law that a conditional reply extinguishes the

original offer.  *See* RESTATEMENT (SECOND) OF CONTRACTS § 59 cmt. a ("A qualified or

conditional acceptance proposes an exchange different from that proposed by the original

offeror.  Such a proposal is a counter-offer and ordinarily terminates the power of acceptance of

the original offeree.").  Thus, the defendants conclude that the April 2004 settlement

agreement—upon which the Korean judgment is based—is null and void.

 The court will reject the defendants' argument for two reasons.  First, it appears that the

defendants made no effort to raise this argument before the Korean court.  Pl.'s Reply at 3

("Regardless of whether Defendants want to correct any previous neglect or to try a different

case strategy, they cannot undo their decisions, waste additional judicial and personal resources,

and re-litigate the seemingly endless disputes that led to the Korean litigation and judgment.").

In LG's words, "the proper place to examine such evidence was before the Korean courts during

the four and a half years of litigation, not before this Court in this action to enforce the Korean

---

[13] As noted earlier, this agreement was worth several million dollars.  Hirota Decl. ¶ 24.

judgment." *Id.*  Indeed, the defendants do not claim that they lacked the opportunity to raise this

argument in Korea.  *See* Defs.' Opp'n at 16.  The defendants' explanation is artfully crafted:

> *Somehow* the Korean litigation managed to proceed without considering the essence of basic
> contract principles: the effect of a conditional reply to an offer, the effect of a withdrawn offer, or
> the effect of elapsed time upon an unaccepted offer.  *Whatever the cause of these shortcomings*,
> they gravely undermine public confidence that law and justice were properly administered.  Such
> a judgment is not worthy of establishing—especially on a summary basis—property rights in the
> United States.

*Id.* (emphasis added).  Moreover, the defendants' counsel in the Korean litigation states that he

first got wind of the defendants' "conditional reply" argument in April 2012, several years after

the Korean decision was rendered.  Kim Decl. ¶ 8.

Given these facts, the court will not entertain the defendants' eleventh-hour claim.  *See*

*Tahan v. Hodgson*, 662 F.2d 862, 867 (D.C. Cir. 1981) (rejecting the defendant's arguments and

extending comity to an Israeli default judgment in part because the "Defendant's arguments . . .

could have and should have been made in Israel.  He cannot fail to contest the Israeli plaintiff

and then declare that he would have won.").  By way of analogy, it is clear that litigants who do

not raise certain arguments at the trial level forfeit their ability to raise those issues on appeal.

*Bennett v. Islamic Republic of Iran*, 618 F.3d 19, 21–22 (D.C. Cir. 2010).  Similarly, litigants

seeking review of an agency's actions cannot pursue arguments they failed to mention at the

administrative level.  *Nuclear Energy Inst. v. EPA*, 373 F.3d 1251, 1297 (D.C. Cir. 2004) ("It is a

hard and fast rule of administrative law, rooted in simple fairness, that issues not raised before an

agency are waived and will not be considered by a court on review.").  Nor may a litigant use a

motion to reconsider as a vehicle for presenting theories or arguments that could have been

advanced earlier.  *See Exxon Shipping Co. v. Baker*, 554 U.S. 471, 485 n.5 (2008); *Kattan v.*

*District of Columbia*, 995 F.2d 274, 276 (D.C. Cir. 1993).  At bottom, the doctrine of comity is

preoccupied with fundamental notions of fairness.  The court deems it manifestly unfair to fault the Korean court for failing to consider an argument that the defendants never raised.[14]

Second, the Korean judgment deserves comity because the defendants were given a full and fair opportunity to litigate their claim.  The defendants were afforded several tiers of appellate review; at each stage, they were represented by counsel.  *See* Defs.' Response to LG's Stmt. of Facts ¶¶ 16–32.  In fact, *the defendants* chose to pursue an appeal in Korea's Supreme Court.  *Id.*  For their appeal, the defendants procured additional counsel from two other Korean law firms.  *Id.* ¶ 29.  At all levels, they were allowed to submit evidence, file pleadings, and present their arguments.  *Id.*

When determining whether to recognize a foreign judgment, courts may turn to the Restatement of Foreign Relations, which lists a number of relevant factors to consider.  Specifically, the Restatement states that a judgment *may* be denied comity if:

> (a)  the court that rendered the judgment did not have jurisdiction over the subject matter of the action;
> (b)  the defendant did not receive notice of the proceedings in sufficient time to enable him to defend;
> (c)  the judgment was obtained by fraud;
> (d)  the cause of action on which the judgment was based, or the judgment itself, is repugnant to the public policy of the United States or of the State where recognition is sought;
> (e)  the judgment conflicts with another final judgment that is entitled to recognition; or
> (f)  the proceeding in the foreign court was contrary to an agreement between the parties to submit the controversy on which the judgment is based to another forum.

RESTATEMENT (THIRD) OF FOREIGN RELATIONS LAW § 482(2).  In comparison, a U.S. *may not* recognize a foreign judgment if the foreign jurisdiction "does not provide impartial tribunals or procedures compatible with due process of law" or if the foreign court lacked jurisdiction.  *Id.* § 482(1).

---

[14]     It appears that the defendants' arguments have evolved at each stage of the litigation.  In rejecting one of their arguments, the Korean Supreme Court noted that it was "a fact newly presented . . . at the Supreme Court that has not been asserted at [the intermediate court of appeals]."  Pl.'s Mot. Ex. 11 at 6.

Nearly all of these factors weigh towards recognition of the Korean judgment. The Korean courts had subject matter jurisdiction, *see id.* § 482(2)(a); the defendants had notice of the proceedings such that they could defend themselves, *see id.* § 482(2)(b); the defendants do not allege that the Korean judgment was obtained fraudulently, *see id.* § 482(2)(c); nor does the judgment conflict with another final judgment that is entitled to recognition, *see id.* § 482(2)(e). The Korean proceedings were not contrary to a forum-selection clause in an agreement between the parties. *See id.* § 482(2)(f). In fact, the settlement agreement selected Korea as an appropriate forum. Kim Decl. ¶ 4.

The defendants nevertheless seize on the sole factor that might support their cause, insisting that the Korean judgment is "repugnant to the public policy of the United States." *See id.* § 482(2)(d). But "[this] standard is high, and infrequently met." *Ackermann v. Levine*, 788 F.2d 830, 841 (2d Cir. 1986); *Ricart v. Pan Am. World Airways, Inc.*, 1990 WL 236080, at *2 (D.D.C. Dec. 21, 1990) ("The public policy exception has been interpreted as a narrow one."). A judgment is repugnant to U.S. policy if it tends to "undermine the public interest, the public confidence in the administration of the law, or security for individual rights of personal liberty or of private property . . . ." *See Somportex v. Phila. Chewing Gum*, 453 F.2d 435, 443 (3d Cir. 1971) (quoting *Goodyear v. Brown*, 26 A. 665, 666 (Pa. 1893). The Circuit has noted that the public policy doctrine, "if not moribund," is "rarely relied upon." *Tahan*, 662 F.2d at 866 n.17. "Only in clear-cut cases ought it to avail defendant." *Id.* (citing Von Mehren & Trautman, *Recognition of Foreign Adjudications: A Survey and a Suggested Approach*, 81 HARV. L. REV. 1601, 1670 (1968)); *see also Loucks v. Std. Oil Co.*, 224 N.Y. 99, 110 (1918) (Cardozo, J.) (concluding that a foreign judgment is repugnant only if "the cause of action in its nature offends our sense of justice or menaces the public welfare"). Thus, a foreign judgment that threatens

fundamental constitutional freedoms might be repugnant to U.S. policy, *Matusevitch v. Telnikoff*, 877 F. Supp. 1, 4 (D.D.C. 1995), *aff'd*, 1998 WL 388800 (D.C. Cir. May 5, 1998), whereas a garden-variety contract dispute likely would not, *see Soc'y of Lloyd's v. Siemon-Netto*, 457 F.3d 94, 99 (D.C. Cir. 2006).

Here, the defendants assert that "justice has not been served in Korea" because the judgment "violates fundamental principles" of contract law. Defs.' Opp'n at 9. But they concede that "Korean law is no different on any of these fundamental points." *Id.* at 16 (citing Kim Decl. ¶ 9). Because there is no difference between American and Korean law on this matter, the defendants' claim boils down to an alleged error of factual or legal analysis. Comity should not be denied on the "mere assertion . . . that the judgment was erroneous in law or in fact." *Medellin v. Dretke*, 544 U.S. 660, 670 (2005) (quoting *Hilton*, 159 U.S. at 158); *see also* RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 106 (1969) ("A judgment will be recognized and enforced in other states even though an error of fact or of law was made in the proceedings before judgment . . . ."). To escape the reach of a foreign judgment, a defendant must allege some fundamental defect in the proceedings abroad. *See, e.g.*, *Bridgeway Corp. v. Citibank*, 45 F. Supp. 2d 276, 287 (S.D.N.Y. 1999) ("First, the record demonstrates that, throughout the period during which the Liberian action was pending, the country was embroiled in a civil war. The country was in a state of chaos, as the various factions fought. The Liberian Constitution was ignored . . . . It is difficult to imagine any judicial system functioning properly in these circumstances."), *aff'd*, *Bridgeway Corp. v. Citibank*, 201 F.3d 134, 142–43 (2d Cir. 2000); *In re Perry H. Koplik & Sons, Inc.*, 357 B.R. 231, 243 (Bkrtcy. S.D.N.Y. 2006) (refusing to accord comity to an Indonesian judgment due to undisputed evidence of pervasive and systemic corruption within the Indonesian judicial system); *Rasoulzadeh v. Associated Press*, 574 F. Supp.

854, 861 (S.D.N.Y. 1983) ("In the case at bar, I have no confidence whatsoever in the plaintiffs'

ability to obtain justice at the hands of the courts administered by Iranian mullahs.  On the

contrary, I consider that if the plaintiffs returned to Iran to prosecute this claim, they would

probably be shot."); *cf. Universal Trading & Inv. Co. v. Kiritchenko*, 2007 WL 2669841, at *14

(N.D. Cal. Sept. 7, 2007) (extending comity to a Ukrainian judgment, despite recognizing that

"[m]ost U.S. businesses consider the [Ukraine's] local and national court systems unpredictable

and try to avoid them," and noting that traces of a "Soviet era criminal justice system" still

existed).  Here, the defendants do not argue that Korea's judicial system suffers from any of

these flaws.  For this reason, perhaps, U.S. courts routinely enforce judgments rendered by

Korean courts.  *See generally Daewoo Motor Am., Inc. v. GMC*, 459 F.3d 1249, 1258 (11th Cir.

2006); *Choi v. Kim*, 50 F.2d 244, 248 (3d Cir. 1994); *Samyang Food Co. v. Pneumatic Scale

Corp.*, 2005 WL 2711526, at *5 (N.D. Ohio Oct. 21, 2005).[15]

　　　　In sum, it seems clear that the defendants were provided with the "opportunity for a full

and fair trial abroad before a court of competent jurisdiction, conducting the trial upon regular

proceedings, after due citation or voluntary appearance of the defendant."  *Hilton v. Guyot*, 159

U.S. at 158.  "[T]here is nothing to show either prejudice in the court, or in the system of laws

under which it was sitting, or fraud in procuring the judgment."  *Id.*  Accordingly, the Court will

recognize the Korean judgment under the doctrine of comity.

---

[15]　　LG also argues that the Korean judgment should automatically be recognized under a commercial
treaty between the two countries.  *See generally* Treaty of Friendship, Commerce, and Navigation
Between the United States of America and the Republic of Korea, art. 5, § 1 U.S.-S. Kor., Nov. 7,
1957, 8 U.S.T. 2217.  Although other circuits have endorsed this view, *see Otos Tech Co., Ltd. v.
OGK Am., Inc.*, 653 F.3d 310, 312–13 (3d. Cir. 2011); *Daewoo Motor Am. v. GMC*, 459 F.3d
1249, 1259 (11th Cir. 2006); *Choi v. Kim*, 50 F.2d at 248; *Seoul Guarantee Ins. Co. v. Young Jik
Shon*, 2008 WL 5235913, at *1–2 (M.D. Ala. Dec. 15, 2008), this Circuit has not reached the
precise issue.  Because LG's motion can be resolved on narrower grounds, this court need not
weigh in on the matter.

### 3. The Court Will Deny LG's Motion in Part Due to Factual and Legal Disputes Regarding the '980 Patent

The parties dispute the scope of the Korean judgment.  In particular, they do not agree whether the Korean judgment should be interpreted to include the '980 patent.  The defendants point out that the Korean judgment does not specifically mention this patent.  Defs.' Opp'n at 21 (citing Kim Decl. ¶ 20); *see* Defs.' Sur-reply at 3 ("The Korean courts did not award LG ownership of patents other than those patents or patent applications specifically listed in the Korean judgment.").  LG concedes this fact but argues that the '980 patent is a "child patent" of the '763 patent, and the latter was mentioned in the Korean judgment.  LG contends that the two patents are so closely related that any reference to one necessarily encompasses a reference to the other.

Although LG's reasoning is persuasive, the matter is not yet so clear as to warrant summary judgment.  In its reply, LG offers an analysis of the factual similarities between the '763 patent and the '980 patent.  *See* Pl.'s Reply at 11–12.  The defendants respond by pointing out a number of factual differences between the two patents.  Defs.' Sur-reply at 3.  Due to the parties' limited briefing in the matter, it is not yet clear whether these differences are legally significant.  In addition, it is not clear whether the parties ever raised the issue of the '980 patent during the Korean litigation.  In their sur-reply, the defendants allege that LG never raised this argument in the Korean proceedings.  But they fail to cite to any evidence in the record.  Defs.' Sur-reply at 3.  At this early stage of the litigation, it is too early to tell whether the parties raised this issue in the Korean litigation, or whether the factual similarity between the two patents is legally dispositive.  Because discovery may provide answers to these questions, the court will deny LG's motion in part.

### D. The Court Will Deny the Defendants' Contingent Motion to Dismiss Counts V–VII Without Prejudice

If summary judgment is granted on the comity issue, the defendants argue, the court should dismiss Counts V (Misappropriation of Trade Secrets), VI (Conversion), and VII (Unjust Enrichment) under the doctrine of *forum non conveniens*. *See* Defs.' Mot. to Dismiss at 9–14. In essence, the defendants argue that LG's claims fall into two categories: Counts I–IV are federal patent claims, whereas Counts V–VII are common-law claims based on Tanaka's misappropriation of LG's proprietary information. The defendants believe that Counts I–IV will be resolved if the plaintiff's motion is granted. Defs.' Mot. to Dismiss at 9. Should partial summary judgment be granted, they argue, "the only remaining counts would involve tort claims arising out of conduct in Asia, and would have no relation to the U.S." *Id.*

LG does not agree. LG insists that granting partial summary judgment would only resolve Count II (Enforcement of the Korean Judgment) and maybe Count IV (Promissory Estoppel), but not Counts I (Correction of Inventorship under 35 U.S.C. § 256) and Count III (Declaratory Judgment). Pl.'s Opp'n at 14–16. LG contends that the Korean ruling was narrow—the court concluded that the parties' settlement agreement was valid, but it did not get into the merits of any underlying patent disputes. Thus, LG seeks relief that the Korean court did not address. For instance, LG contends that it is entitled to damages for the defendants' improper use of its technology under Count III—a sum that the Korean court did not decide. *Id.* at 15. LG also argues that discovery will be necessary for Count I, which requires the court to determine who actually invented the patented technology—again, an issue that the Korean court did not decide.

The court need not resolve the parties' differences. The court concludes that at least some portion of Count II is still alive and well because of the factual disputes regarding the '980

patent.  Because this claim remains unresolved, it would be premature to dismiss Counts V–VII under the doctrine of *forum non conveniens*.  The court will therefore deny the defendants' contingent motion to dismiss—but without prejudice.

## IV. CONCLUSION

In sum, the court will: (1) decline the defendants' invitation to stay the proceedings; (2) grant Tanaka's motion to dismiss for lack of personal jurisdiction; (3) grant in part and deny in part LG's motion for partial summary judgment; and (4) deny without prejudice the defendants' contingent motion to dismiss Counts V–VII.  An order consistent with this memorandum opinion shall be separately issued this 28th day of January, 2013.

RUDOLPH CONTRERAS
United States District Judge